JOANNE ROCAMORA *v.* PETER HEANEY ET AL.

JOANNE ROCAMORA *v.* ELIZABETH ACTON
(AC 33610)

Gruendel, Alvord and Lavery, Js

660

Argued November 28, 2012—officially released August 6, 2013

*John L. Laudati*, with whom, on the brief, was *P. Jo Anne Burgh*, for the appellant (plaintiff).

*Matthew G. Berger*, for the appellees (defendant Peter Heaney et al.).

*Paul M. Geraghty* filed a brief for the appellees (defendant John P. Petrillo, Jr., et al.).

*Opinion*

LAVERY, J. In this consolidated action to quiet title, the plaintiff, Joanne Rocamora, appeals from the trial court's judgments quieting title in favor of the defendants in the first case, Peter H. Heaney, Patricia Heaney Farr, Helen Heaney, and Michael K. Heaney, and the defendants in the second case, Patricia Acton and Marilyn Moss, determining that a map prepared by the defendants' expert established the boundary lines and titles to the plaintiff's property and three other lots.[1] The plaintiff claims that the court erred in (1) failing to resolve the boundary dispute in a manner consistent with the expressed intent of the original grantor and the original grantees, (2) finding that the boundary lines were other than those set forth in the map referred to in the deed, because no other map was in the chain of title, (3) admitting another map into evidence even though it was irrelevant and inadmissible hearsay, and (4) finding that the map referred to in the deed could not be scaled. We disagree, and therefore, affirm the judgment of the trial court.

The record reveals the following facts and procedural history. The parties are the owners of lots 11, 12, 13 and 14 depicted on a 1919 map entitled "Plan of Beach Point on West Bank of Niantic River, East Lyme, Conn."

---

[1] The trial court granted a motion to consolidate two quiet title actions commenced by the plaintiff. We refer in this opinion to the defendants in the first action, Peter H. Heaney, Patricia Heaney Farr, Helen Heaney, and Michael K. Heaney, collectively, as Heaney.

The named defendant in the second action was Elizabeth Acton. At trial, the parties stipulated on the record that Patricia Acton and Marilyn Moss were the real parties in interest and they were substituted as defendants. We refer in this opinion to Patricia Acton and Marilyn Moss, collectively, as Acton.

The court also approved, with the consent of all parties, the addition of defendants John P. Petrillo, Jr. and Gail Petrillo as trustees of the Petrillo Real Estate Trust, whose property was conveyed by the same owner as the other parties' property as part of a four-lot subdivision of a single parcel.

(1919 map). The lots, located between the east side of Elizabeth Street and the Niantic River in the Saunders Point area of East Lyme, were originally conveyed out of property owned by Grace Barnard Smith, at or about the same time in 1919. A complete chain of title for each lot was put into evidence and indicated the following: Lot 11, which is the northernmost of the four lots and is known as 2 Elizabeth Street, is owned by the defendants John P. Petrillo, Jr., and Gail Petrillo as trustees of the Petrillo Real Estate Trust (Petrillo lot).[2] Lot 12, directly to the south of the Petrillo lot and known as 4 Elizabeth Street, is owned by Acton (Acton lot). Lot 13, directly to the south of the Acton lot and known as 6 Elizabeth Street, is owned by the plaintiff (Rocamora lot). Lot 14, directly to the south of lot 13 along the north side of Round Rock Road, known as 8 Elizabeth Street, is owned by Heaney (Heaney lot). Each of the four original deeds executed by Smith contains a description of the property using metes and bounds and refers to certain monuments on the ground. Each deed also refers to the 1919 map and contains the following condition: "The conditions upon which this deed is granted are as follows: The lines on the map above referred to are agreed upon and accepted by the grantees herein."

At issue in the quiet title actions are the parties' conflicting opinions of the location of the boundaries between the properties, and the impact of the boundary locations on ownership of triangular sections of land along those boundaries, especially between the Acton and Rocamora lots and between the Rocamora and Heaney lots. The parties stipulated to, among other items, the following: "The plaintiff asserts that there

---

[2] We refer in this opinion to John P. Petrillo, Jr., and Gail Petrillo, collectively, as Petrillo. Sometime after the original conveyances from Smith, Petrillo acquired additional land to the north of their lot that was not part of the original conveyance and not included in the Petrillo lot on the 1919 map.

are boundary discrepancies between the 1919 . . . map, the metes and bounds description referenced in each of the parties' chains of title, and the monuments on the ground." According to the court, the dispute arose "because of the quality of the 1919 map and its lack of detail [and] the disparity between that map and the metes and bounds descriptions given in the deeds themselves." Because of the dispute, each of the parties commissioned its own survey. Each expert prepared his own map depicting what he considered to be the accurate boundaries of all four lots. The plaintiff's surveyor and expert witness, Richard Meehan, placed on his map (Meehan map) the Rocamora/Acton boundary a few feet to the north of where the boundary was placed by the surveyor hired by Heaney and Acton, and placed the boundary with the Heaney lot slightly to the south of where it was placed by the surveyor hired by Heaney and Acton, with the result that the plaintiff would own the disputed triangular slivers along the northern and southern edges of her property. J. Robert Pfanner, the surveyor and expert witness hired by Heaney and Acton, placed the Rocamora/Acton boundary a few feet farther to the south on his map (Pfanner map), with the result that Acton would own the disputed triangular sliver there, and the Rocamora/Heaney boundary a few feet farther to the north, so that Heaney would own the disputed triangular sliver there.[3] The amount of land in dispute increases as the boundaries approach the river, with the result that the Pfanner map assigns more land along the riverfront to the Acton and Heaney lots, and less to the Rocamora lot.

---

[3] The dispute also involved ownership of a reserve area between the four lots and the Niantic River that was conveyed as a common ownership area to the four original grantees by Smith. The parties stipulated that each property owner would have exclusive ownership of that part of the common area adjacent to each owner's lot, with the boundaries determined by extending to the Niantic River whatever line the court determined to be the boundary between each of the lots.

During a two day trial, the court heard testimony from Meehan and Pfanner regarding their respective opinions of where the boundaries lay as well as of the accuracy and reliability of the 1919 map. Each expert's map was introduced into evidence, and each testified about the methodology he used to conduct his survey. Testimony about the reliability of the 1919 map included the following: it did not meet standards for a class A-2 survey;[4] it contained ambiguities; it did not contain angles; it did not depict the reserve area mentioned in the deed; lines on the map did not agree with deed descriptions; it was "a very poor map, even for 1919"; and it could not be "scaled" accurately.[5] The court also heard testimony from Elizabeth Acton, who testified to finding in a safe deposit box another survey map, prepared in 1920 by the firm Daboll & Crandall (1920 map). That map, also admitted into evidence, depicted substantially the same boundaries as those found by Pfanner. Michael Heaney also testified about the use by the Heaney family of land in the disputed area between the Heaney and Rocamora lots. In addition to the Pfanner, Meehan and 1920 maps, a survey map prepared in 2007 for the plaintiff by Lloyd Pearson, and which also substantially agreed with the Pfanner map, was introduced into evidence. Petrillo introduced into evidence a survey map prepared by another surveyors' firm, the LRC Group, which depicts only the Petrillo lot, but shows approximately the same boundary between the Petrillo and Acton lots as does the Pfanner map. Only the 1919 map was recorded in the chain of title for any of the four lots.

---

[4] A class A-2 survey is one that meets certain standards for linear and angular precision and accuracy as specified in Regs., Conn. State Agencies § 20-300b-11.

[5] The surveyors testified in detail about their efforts to "scale" the map, demonstrating in the courtroom the act of measuring a distance on the map and using the distance scale on the map to calculate the actual distance that it depicted.

In its memorandum of decision, the court credited the methodology used by Pfanner, whose survey relied on the metes and bounds descriptions in the deed and the monuments on the ground and found minimal discrepancy between the two. The court rejected the methodology used by Meehan, whose survey relied heavily on the lines on the 1919 map. Accordingly, the court rendered judgment that the titles and boundaries to the four lots in question were those as established in the Pfanner map. This appeal followed.

The plaintiff first claims that the court erred in failing to resolve the quiet title action in a manner consistent with intent of the original grantor and grantees. In support of this claim, the plaintiff argues that because Smith included in the four original deeds an express condition that the 1919 map determined the property boundaries, any lines or boundaries that do not agree with the map must be rejected. We begin with the relevant legal principles concerning the construction of deeds. "[T]he determination of the intent behind language in a deed, considered in the light of all the surrounding circumstances, presents a question of law on which our scope of review is plenary. . . . The meaning and effect of the [language in the deed] are to be determined, not by the actual intent of the parties, but by the intent expressed in the deed, considering all its relevant provisions and reading it in the light of the surrounding circumstances." (Internal quotation marks omitted.) *Simone* v. *Miller*, 91 Conn. App. 98, 108, 881 A.2d 397 (2005).

"In the construction of a deed or grant, the language is to be construed in connection with, and in reference to, the nature and condition of the subject matter of the grant at the time the instrument is executed, and the obvious purpose the parties had in view. . . . [I]f the meaning of the language contained in a deed or conveyance is not clear, the trial court is bound to

consider any relevant extrinsic evidence presented by the parties for the purpose of clarifying the ambiguity. . . . Furthermore, [a] reference to [a] map in [a] deed, [f]or a more particular description, incorporates [the map] into the deed as fully and effectually as if copied therein. . . . [T]he identifying or explanatory features contained in maps referred to in a deed become part of the deed, and so are entitled to consideration in interpreting the deed as though they were expressly recited therein." (Internal quotation marks omitted.) Id., 109. "In construing a deed, a court must consider the language and terms of the instrument as a whole." *Lake Garda Improvement Assn.* v. *Battistoni*, 160 Conn. 503, 511, 280 A.2d 877 (1971). This is so not just when the words in a deed are ambiguous, but also when the court determines that a map is unclear or ambiguous. Id.

As demonstrated by this court's holding in *Simone*, descriptions on a map referred to in a deed are to be credited "as fully and effectually" as if they were words in the deed. *Simone* v. *Miller*, supra, 91 Conn. App. 109. It is true, as the plaintiff contends, that the relevant deeds all refer to the 1919 map and all contain a condition that the grantees agreed to the lines depicted on it. The plaintiff argues that this express condition renders the intent provided in the deed "clear and unequivocal." It is also true, however, that each original deed contains, after the language of conveyance and immediately after the reference to the map, the words "and bounded and described as follows," followed by a metes and bounds description of the property boundaries. Those descriptions, which include references to monuments, correspond to the locations of monuments found by Pfanner.

The plaintiff argues that because the deed descriptions do not match the 1919 map, and because of discrepancies in distance ranging from zero feet to two

feet between some lines as described in the deed and the corresponding lines that Pfanner found by using monuments, the metes and bounds descriptions that disagree with the 1919 map must be the result of scriveners' errors. There is no evidence in the record, however, other than the discrepancies themselves, that those descriptions were the result of scriveners' errors. Additionally, Pfanner testified that the minor discrepancies between the deed descriptions and the monument locations were common at the time the property was originally conveyed by Smith. "[W]here the boundaries of land are described by known and fixed monuments which are definite and certain, the monuments will prevail over courses and distances." (Internal quotation marks omitted.) *Velsmid* v. *Nelson*, 175 Conn. 221, 227, 397 A.2d 113 (1978).

The plaintiff has provided no authority for the proposition that terms and descriptions on a map, even when recorded or made a condition of a deed, take precedence over other descriptive terms or references to monuments in a deed. Instead, our law is clear on the proper method of resolving such discrepancies. "[W]hen a deed sets forth two different descriptions of the property to be conveyed, the one containing the less certainty must yield to that possessing the greater, if apparent conflict between the two cannot be reconciled." (Internal quotation marks omitted.) *Simone* v. *Miller*, supra, 91 Conn. App. 109. "[W]here the testimony of witnesses as to the location of the land described in deeds is in conflict, it becomes a question of fact for the determination of the court which may rely upon the opinions of experts to resolve the problem and it is the court's duty to accept that testimony or evidence which appears more credible." (Internal quotation marks omitted.) *Har* v. *Boreiko*, 118 Conn. App. 787, 796, 986 A.2d 1072 (2010). "The credibility of the witnesses and the weight to be accorded to their testimony

is for the trier of fact. . . . [An appellate] court does not try issues of fact or pass upon the credibility of witnesses." (Internal quotation marks omitted.) Id., 795.

After our plenary review of the record, we conclude that the conflicting descriptions in the deeds between the map and the metes and bounds descriptions rendered the intent in the deed unclear, and therefore, the court was correct in considering "any relevant extrinsic evidence introduced by the parties"; (internal quotation marks omitted) *Simone* v. *Miller*, supra, 91 Conn. App. 109; to determine the intent expressed in the deed. Because the court's determination of that intent was based largely on its assessment of each expert's credibility, we will not overturn it on that basis.

With regard to the plaintiff's second claim, that the Pfanner map and the other unrecorded maps that were in evidence could not be used to determine title because they were not in the chain of title for any of the lots, the plaintiff misstates their relevance to this case. The court did not determine that any of those maps provided notice to the grantees of boundary lines or other elements of title, which was the determinative issue in the cases cited by the plaintiff. See *Powers* v. *Olson*, 252 Conn. 98, 109, 742 A.2d 799 (2000); *Kulmacz* v. *Milas*, 108 Conn. 538, 144 A. 32 (1928); *Marshall* v. *Soffer*, 58 Conn. App. 737, 743–44, 756 A.2d 284 (2000). Instead, the court noted those maps among the many sources of relevant evidence that supported Pfanner's methodology, making his testimony more credible than that of Meehan. Because those maps were not used provide notice of title, the plaintiff's argument is, therefore, without merit.

The plaintiff next claims that the court erred in admitting the 1920 map, because as an unrecorded map outside the chain of title, it was irrelevant, and because it was hearsay that did not satisfy the requirements of a

statement in an ancient document under Connecticut Code of Evidence § 8-3 or a hearsay statement of ancient private boundaries under § 8-6. We are not persuaded. In addition to our conclusion, discussed previously, that the 1920 map was not used to determine or give notice of title or boundaries, we note that our law gives the trial court wide discretion to admit relevant evidence. "The trial court's ruling on the admissibility of evidence is entitled to great deference. . . . [T]he trial court has broad discretion in ruling on the admissibility . . . of evidence . . . [and its] ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion. . . . Moreover, evidentiary rulings will be overturned on appeal only where there was an abuse of discretion and a showing [by the party objecting to admission] of substantial prejudice or injustice." (Citations omitted; internal quotation marks omitted.) *Jacobs* v. *General Electric Co.*, 275 Conn. 395, 406, 880 A.2d 151 (2005). In admitting the 1920 map, the court was not, as the plaintiff argues, interpreting our code of evidence, but rather was determining whether the map met the standards in that code. The plaintiff's arguments in support of her claim challenge the court's application of our code of evidence to the facts, not its interpretation of what our code requires. We review the admission of this evidence, therefore, for abuse of discretion.

We need not address whether the map properly satisfied either of the two hearsay exceptions under which the defendants sought to have it admitted, because even if the court erred in admitting the evidence, the party challenging its admission "bears the burden of demonstrating that the error was harmful." (Internal quotation marks omitted.) *In re Galen F.*, 54 Conn. App. 590, 601,

737 A.2d 499 (1999). The plaintiff has not done so here. The plaintiff's entire argument for harmful error rests on two assertions, that the map bolstered Pfanner's credibility and that the court's reference to it shows "the extent to which the court gave weight to the Pfanner map's agreement" with it. The court referred to the 1920 map only once in its analysis, mentioning it as one of several pieces of evidence that supported Pfanner's determination of the proper boundaries in question. Pfanner, upon whose testimony the court relied in rendering its judgment, testified that he did not use the 1920 map in conducting his survey, because it had not been discovered yet. The plaintiff has failed to demonstrate that the court's admission of, and minimal reliance on, the 1920 map created a substantial prejudice or injustice, or, given the other evidence available to the court, that it was harmful at all. Accordingly, we will not overturn the court's decision to admit it.

Finally, the plaintiff claims that the court erroneously determined that the 1919 map could not be scaled, because Meehan testified that it could be scaled, and because on cross-examination Pfanner admitted that it could be scaled. "A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Seymour* v. *Region One Board of Education*, 274 Conn. 92, 104, 874 A.2d 742, cert. denied, 546 U.S. 1016, 126 S. Ct. 659, 163 L. Ed. 2d 526 (2005). Although the court did hear testimony that it was possible to scale the map, it also heard the previously mentioned testimony that it could not be scaled accurately or at all. On the entire evidence presented, we are not persuaded that a mistake was committed.

The judgment is affirmed.

In this opinion the other judges concurred.