******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

APPENDIX

LUTHER E. THURLOW ET AL. *v.* LEE
ANN HULTEN ET AL.*

Superior Court, Complex Litigation Docket at Hartford
File No. X04-CV-05-4059315-S

LEE ANN HULTEN ET AL. *v.* LUTHER E.
THURLOW ET AL.

Superior Court, Complex Litigation Docket at Hartford
File No. X04-CV-09-4050303-S
Memorandum filed October 15, 2014

*Proceedings*

Memorandum of decision in action in first case, inter alia, to quiet title, and, in second case, for, inter alia, declaratory judgment. *Judgment in part for the plaintiffs in the first case, defendants in the second case, and in part for the defendants in the first case, plaintiffs in the second case.*

*Richard S. Cody* and *Jon B. Chase,* for the plaintiffs in the first case, defendants in the second case.

*Michael S. Bonnano,* for the defendants in the first case, plaintiffs in the second case.

*Opinion*

BRIGHT, J.

I

INTRODUCTION

This case arises out of a property dispute between adjoining landowners in Canterbury. The plaintiffs in the 2005 action, Luther E. Thurlow, Anthony Denning and Steven Pelletier ("Thurlow Parties"), claim that the defendants in that action, Lee Ann Hulten and Linda K. Dieters ("Hulten Parties"), have interfered with the Thurlow Parties' rights to access their lots from Gooseneck Hill Road via an easement over the Hulten Parties' property. The Hulten Parties deny that the Thurlow parties have such an easement.

In the 2009 action, the Hulten Parties claim that the Thurlow Parties have been trespassing on their property because the Thurlow Parties have misidentified the boundaries of one of their lots that abuts the Hulten Parties' property. The Thurlow Parties dispute this claim. Thus, the Hulten Parties have asked the court to resolve this boundary dispute by ruling on their quiet title action in the 2009 action.

The specific claims asserted by the parties are as follows. In the 2005 action, the First Count of the Thurlow Parties' Amended Substituted Complaint dated September 17, 2013, seeks to quiet title in their alleged easement over the Hulten Parties' property. The Fourth Count seeks an injunction prohibiting the Hulten Parties from obstructing the easement.[1] In the Fifth Count, the Thurlow Parties claim that the Hulten Parties have trespassed on their easement. The Sixth Count claims that the Hulten Parties have negligently breached a duty they owed to the plaintiffs by not allowing them to haul wood they cut on their property over the easement. The Seventh Count alleges that this same conduct constitutes a conversion of the Thurlow Parties' cut wood. The Eighth Count alleges that the Hulten Parties have tortiously interfered with Denning's business relations by not letting him remove the cut wood. Finally, the Ninth Count alleges that the Hulten Parties have tortiously interfered with the Thurlow Parties' contractual relationship with the parties that sold them the lot, which is supposed to benefit from the alleged easement.

The Hulten Parties have denied the existence of an easement. They also dispute the Thurlow Parties' claimed scope of any such easement.

In the 2009 action, in Count One of the Third Amended Complaint dated May 19, 2011, the Hulten Parties seek a declaratory judgment that the easement claimed in the 2005 action, if proven to exist, is limited to only a portion of the Hulten Parties' property, described as Lot A. They allege that the easement does not extend over what they identify as Lot B. In Count

Two, the Hulten Parties seek an injunction prohibiting the Thurlow Parties from using the alleged easement on Lot B. In Count Three, the Hulten Parties seek to quiet title as to the size and boundaries of Lot B. Count Four seeks damages for the Thurlow Parties' unauthorized cutting and removal of timber from what the Hulten Parties believe is their Lot B.

In response, the Thurlow Parties have asserted counterclaims in the 2009 action claiming an easement by necessity and/or an easement by implication over Lot B. They also dispute the Hulten Parties' claims as to the boundaries of Lot B.

The court severed the parties' claims for damages and instead went forward with a trial on the primary questions that underlie all of the claims. First, do the Thurlow Parties have an easement over the property of the Hulten Parties? Second, if so, what is the scope and precise location of the easement? Third, what are the proper boundaries of the Hulten Parties' Lot B? Resolution of these questions would necessarily resolve a number of the counts of the parties' complaints and counterclaims and could resolve all of the claims asserted.

The trial proceeded before the court over three days. The court heard from a number of witnesses, including Denning, Hulten, Raymond Hulten (Hulten's husband), John Dieters (Dieters' husband), Alexander Osiper (an abutting landowner), Kristen Estabrooks (Thurlow Parties' title searcher), Bruce Woodis (Thurlow Parties' expert land surveyor), and Gerald Stefon (Hulten Parties' expert land surveyor). The court also received hundreds of exhibits, including deeds and maps relating not just to the lots at issue but to several abutting properties. Some of these records date back to the 1700s. Following trial, the parties submitted posttrial briefs, supplemental briefs and reply briefs. The court also conducted two site visits, one before trial and one after all of the briefs had been filed.

## II

## FINDINGS OF FACT

Based on all of the evidence submitted, the court makes the following findings of fact. The court first addresses the facts as they relate to the Thurlow Parties' claim of an easement from Gooseneck Hill Road to reach their property. The Thurlow Parties are owners of a lot, approximately 9.33 acres in size, located west of Route 169, north of Gooseneck Hill Road, west of Lisbon Road and south of Phinney Lane in the town of Canterbury. Exhibit 1. The parties have referred to this lot as the Rainsford Lot, or Lot 21. Id. The property is bordered on the east by property owned by Donald Minski. It is bordered on the north (Lot 20), south (Lot 30),[2] and east (Lot 31) by other lots owned by the Thurlow Parties. The parties agree that exhibit 1 accu-

rately sets forth the dimensions of Lot 21. The Thurlow Parties acquired their rights in Lot 21 from Leonard Montesi, Steven Marien and Kenneth Thomas in two deeds on April 10, 2003. A warranty deed conveyed title to Lot 21 as set forth in schedule A to the deed. Exhibit 77. That deed made no mention of an easement or right-of-way over any other property, even though it is undisputed that Lot 21 is landlocked and does not have direct access onto a public road or highway. A second quitclaim deed conveyed to the Thurlow Parties any interest the grantors had not only in the property itself but also to a "second tract or right of way as deeded to Frank Tillinghast by Mrs. George Bromley Adm. of Estate of Joseph Farnum and is described as follows;— A right of way from my house across two lots and through wood; and following the path thence to what is called the Rainsford Wood lot, for the purpose of going to and from said lot, cut and cart wood and timber standing on said lot and occupying said lot, always putting up bars on said lot." Exhibit 78. The right-of-way language incorporated in exhibit 78 does in fact quote from a deed from Mrs. George Bromley on December 24, 1903, purporting to grant a right-of-way from her house to the Rainsford Lot for the purposes set forth in exhibit 78. Exhibit 70. At the time of this grant, Mrs. Bromley, as administratrix for the estate of Joseph Farnum, owned property abutting Gooseneck Hill Road that is now owned by the Hulten Parties and is described by them as Lot A. Exhibit 159 accurately sets forth the boundaries and dimensions of the property owned by Mrs. Bromley at the time she granted the right-of-way to the Rainsford lot in 1903 and of Lot A as owned by the Hulten Parties today. That lot is identified on exhibit 159 as "Property of Lee Ann Hulten & Linda K. Dieters 2nd Tract." Exhibit 159. It is undisputed that Bromley did not own either Lot B or Lot 30, whether as described by the Thurlow Parties (exhibits 2 and 144E) or by the Hulten Parties (exhibit 159, fourth tract). Furthermore, there is no evidence that the owners of the property between Bromley's property and the Rainsford Lot (Lot 21) ever gave Bromley or her predecessor in title a right-of-way to cross their property to reach Lot 21. Consequently, Bromley could not grant in exhibit 70 an express right-of-way over land that she did not own. For this same reason, the Thurlow Parties could not acquire an express right-of-way across Lot B, even as they define it, when they acquired Lot 21 because neither the grantors of that lot, nor their predecessors in interest, had ever received an expressed right-of-way beyond what is now described as Lot A.[3] For the above reasons, the court finds that the Thurlow Parties have an expressed right-of-way across Lot A (the second tract on exhibit 159) to access Lot 21 provided that they have some other rights to cross Lot B and Lot 30 to get to Lot 21.[4]

The Thurlow Parties argue that they have either an

easement by implication or an easement by necessity to cross Lot B. In particular, the Thurlow Parties argue that there is evidence of a well-worn path that travels from Gooseneck Hill Road, through Lots A and B, Lot 30 and onto Lot 21. In fact, the parties have stipulated that the path shown on an aerial photograph (exhibit 13A) in 1934 running from Gooseneck Hill Road, through the Hulten Parties' property and Lot 30, to Lot 21 has been in existence continually from 1934 until the present. Furthermore, the court credits the Thurlow Parties' expert's testimony that that path, also identified on exhibit 144E, is most likely the right-of-way described in the deed from Mrs. Bromley to Tillinghast in 1903. The court further finds that this path represents the location of the right-of-way, to the northern border of Lot A, as opposed to the more westerly path depicted on Lot A (second tract) on exhibit 159.[5]

There is no evidence, though, that any owner of Lot 21, prior to the Thurlow Parties, ever used the path to access Lot 21. Hulten testified that during her fifty-four years living on Lot A and Lot B, she has walked the path, but only up to the border of what the Thurlow Parties claim is the southern boundary of Lot 30. Exhibit 2. The court received no evidence of anyone other than the owners of Lot B using the path as it exists on that lot.

The Thurlow Parties suggest that because the path has been traveled uninterrupted from Gooseneck Hill Road to Lot 21 for decades, the court should infer that the various owners of the lots between those two points always intended that the owners of Lot 21 would have an easement over the entire path to and from Gooseneck Hill Road. Other than the existence of the path itself, there is no evidence to support this suggestion. No witness testified to such use and no documents prove it.

The only possible evidence of such intended use was the February 11, 1918 deed from Stephen Finn to Michael and James Shea that created Lot 30. Exhibit 29. After describing the property to be conveyed, the deed describes the grant of "the right of way to and from said land as the path now runs." Id. At the time of this grant, Finn also owned Lot B. Thus, the right-of-way included in exhibit 29 could be read as granting the right to use the path heading south toward Gooseneck Hill Road. The problem with such an interpretation is that Finn did not own Lot A, and therefore could not grant a right-of-way to continue on the path to the road.

He did, however, own the land abutting Lot 30 to the south, including Lot B, and running all the way east to Route 169. The evidence established that there is a path that runs easterly over the land owned by Finn in 1918 out to Route 169. The evidence further showed that there is a path that runs from the lower part of what the Thurlow Parties claim is Lot 30, briefly over a neighbor's (Osiper) property onto the land formerly owned by Finn

and connecting with the path that runs to Route 169. Exhibit 2. In addition, one could travel from the bottom of Lot 30, as claimed by the Thurlow Parties, unto Lot B and travel east to access the path to Route 169.

Based on all of the above, the court concludes that the more reasonable interpretation of the right-of-way in the deed from Finn to Shea is that it expresses a right-of-way from Lot 30, easterly to Route 169. This is the same conclusion reached by the Thurlow Parties' expert, Woodis. On his map designating his conclusions as to the proper boundaries of Lot 30, Woodis set forth his interpretation of the right-of-way language in exhibit 29. After quoting the right-of-way language from the deed, Woodis concluded that "the existing path from Lot #30 to Route #169 substantially fits this description and is in fair condition." Exhibit 2, n.5. For these reasons, the court finds that exhibit 29 does not express an intent to create an easement from Lot 30 south over Lot B toward Gooseneck Hill Road.

Denning did testify about the path to Route 169 and his attempted use of the path. In addition, the court walked part of the path. Denning testified that the path was difficult to travel and that he damaged his truck while trying to traverse it. In addition, when the court walked the path in June of this year, it noticed a number of areas where the path was either wet or swampy. Furthermore, Osiper, the landowner immediately north of the path, described a swampy area along the path where it bordered his property. These facts are somewhat at odds with Woodis' overall description of the path as being in fair condition. In addition, the court heard no evidence regarding the condition of the path when Finn created the right-of-way in 1918. Furthermore, the court was presented with no evidence as to whether the portions of the path that were wet or swampy could be maintained or improved to make the path more suitable for its intended use. Consequently, the evidence that part of the path to Route 169 is currently wet or difficult to pass does not undermine this court's conclusion, based on the entire record, that it is the right-of-way Finn intended to create in 1918.

In connection with the Thurlow Parties' easement by necessity claim, the court also heard evidence regarding access to Lot 21 from Phinney Lane to the north. Denning admitted using a path that runs from Lot 21 north to Phinney Lane to remove timber he cut from Lot 21 and the surrounding lots owned by the Thurlow Parties. He testified, though, that it was less convenient than going south to Gooseneck Hill Road. He also claimed that a temporary bridge had to be built to allow passage to Phinney Lane, and other temporary structures that required permits had to be built to cross wetlands.[6]

By contrast, John Dieters testified that he walked from Lot 21 north to Phinney Lane in the spring of 2013 and took pictures of the condition of the path.

He testified that the path was well traveled and, at approximately twenty feet wide, was wide enough for a truck or tractor. His pictures confirmed his testimony. Exhibit 153C. The court reached the same conclusion when it walked the path to Phinney Lane in June of this year. In fact, the condition of the path to Phinney Lane was at least as good for travel, if not better, than the path to Gooseneck Hill Road. Unlike the path that leads to Route 169, the path to Phinney Lane was nowhere wet or swampy. Nor was there any indication of water having retreated from the property recently. There was simply no indication whatsoever that the path could not be used to haul timber from Lot 21. For these reasons, the court finds the path from Lot 21 to Phinney Road to be an acceptable alternative route for the Thurlow Parties to access Lot 21.[7]

The court now turns to the facts relating to the Hulten Parties' claims relating to the boundaries of Lot B. The Hulten Parties acquired what they refer to as Lot B from Margaret Davignon on December 30, 1992, by a quitclaim deed. Exhibit 65. The deed actually conveyed five separately described tracts. The Fourth Tract is what the Hulten Parties refer to as Lot B. It is described as: "Bounded northerly by land, now or formerly of Shea Brothers and land now or formerly of Andrew Lutzyk; Easterly by land now or formerly of E. LaVerne Kilpatrick at a stone wall on the easterly side of this 25 acre lot; southerly by land formerly of Ira Smart and land formerly of Kuzzyk and Olenik; Westerly by land now or formerly of Rose Salpietro; This described tract contains about twenty-five (25) acres of land." Id.[8] This description has remained unchanged in the chain of title for Lot B since the property was first conveyed by E. LaVerne Kilpatrick in 1928 to Kuzzyk and Olenik from Kilpatrick's larger parcel that he had acquired from Stephen Finn and which extended to Route 169. Exhibit 59A.

The history of the entire parcel that Finn first acquired and then conveyed to the Shea brothers and Kilpatrick is at the heart of the parties' boundary dispute. On November 12, 1889, Simeon Vinton and Nathan White conveyed a large parcel, known as the Ensworth Farm, to Finn. Exhibit 34. The deed conveying the parcel included a detailed description that set forth a mathematical calculation of the property. The parties agree that the property conveyed to Finn is accurately set forth in the blue area of the compilation plan prepared by Stefon and entered into evidence as exhibit 94. The total area of the parcel was 147 acres and 127 rods.[9]

On February 11, 1918, Finn conveyed a portion of the Ensworth Farm, in particular what the parties call Lot 30, to Michael and James Shea. Unfortunately, Finn did not describe his grant to the Shea brothers with the same precision as Vinton and White used in conveying the property to Finn. Finn described the grant as: "One

certain tract of land being a wood lot with all cut wood and timber thereon. Situated in the Town of Canterbury on the West side of the highway leading from Nathan Newton's residence to the residence of Henry Baldwin. Said lot is located about one half mile from said highway. Bounded as follows—viz: North, by the lands of George Tillinghast and Nathan Newton. West by the lands of Mary E. Sawyer and Nathan Newton. South by land of Mary E. Sawyer. East by land of Stephen Finn: Containing about Twenty acres be the same more or less: With the right of way to and from said land as the path now runs." Exhibit 29. The deed was not recorded until over ten years later on July 7, 1928. Id.

The parties and their experts all agree that this deed is ambiguous. First, although Finn called out the eastern boundary of the wooded lot as his property, he did not say how far into his property the conveyed lot went. Because Finn did not identify his property as being on the western boundary of the conveyed lot, one can reasonably infer that the eastern boundary of the grant was on the most westerly side of what Finn received from Vinton and White. From that point, Finn's property, though, extended easterly for dozens of acres to Route 169. Exhibit 29 fails to specify how far east into his land he intended the conveyed property to extend.

Second, no matter where one tries to set the grant from Finn to Shea, it is not possible to get all of the abutter calls to match. Both experts tried to do so and were unsuccessful.

Third, while the deed estimated the amount of property it intended to convey, it made clear by the use of "more or less" that the acreage grant was not intended to be precise. Furthermore, if one attempts to limit the Shea grant to twenty acres, as Stefon does, it leads to inaccuracies in acreage calls in deeds for abutting properties, including Lot B.

The deed, though, does give some indication of the intentions of Finn and Shea through the use of the phrase "wood lot." The court credits Woodis' testimony that this phrase shows an intention to convey an area of land enclosed by some monuments or visible boundaries.[10] Woodis and his team conducted field work to determine if any such monuments existed. What they found were stone walls and stone piles that created the boundaries of a lot that matches the Thurlow Parties' claim as to the boundary of Lot 30. Exhibit 2. There were no stone walls, stone piles or other monuments within the boundaries identified by Woodis that indicated an intention by Finn and Shea to confine the wood lot to a smaller or different area.

On April 13, 1922, Finn then conveyed the rest of the Ensworth Farm, other than what he conveyed to the Shea brothers, to E. LaVerne Kilpatrick. Exhibit 46G. While the deed for this conveyance was recorded six

years before exhibit 29, it is clear that Kilpatrick was aware of the grant to Shea when he received his grant from Finn. The deed he received specifically excluded "the (20) Twenty Acres sold to the Shea Brothers of Jewett City, Town of Griswold." Exhibit 46G. The deed otherwise described the property being conveyed to Kilpatrick mathematically, using most of the same measurements from the deed from Vinton and White to Finn. Unfortunately, the mathematical description in the deed is incomplete. It does not describe a closed plot. Exhibit 95. Depending on which expert opinion the court accepts, Finn's mathematical description either leaves a small gap at the top of what the Thurlow Parties claim is Lot B or it fails to describe the mathematical calculations of four much larger lengths that encompass what the Hulten Parties claim are the boundaries of Lot B. (Compare red outline on exhibit 95 with hatched blue area on same exhibit.) Consequently, the court must turn to other extrinsic evidence to determine what Finn and Kilpatrick intended to include in their transaction, and what they understood to be excluded as having already been conveyed to the Shea brothers.

The court finds that such evidence exists in the conveyance six years later, on October 31, 1928, from Kilpatrick to Kuzzyk and Olenik. Exhibit 59A. As noted above, this conveyance is of the same parcel that is the Fourth Tract the Hulten Parties acquired in 1993, referred to by the parties as Lot B. In fact, the description Kilpatrick gave of the part of the Ensworth Farm he was conveying in the deed to Kuzzyk and Olenik is functionally identical to the description of the Fourth Tract in the deed from Davignon to the Hulten Parties: "Bounded northerly by land, now or formerly of Shea Brothers and land now or formerly of Andrew Lutzyk; Easterly by other land of this Grantor at a stone wall on the easterly side of this 25 acre lot; southerly by land formerly of Ira Smart and land formerly of Kuzzyk and Olenik; Westerly by land now or formerly of Rose Salpietro; This described tract contains about twenty-five (25) acres of land." Compare exhibits 59A and 65. As the Thurlow Parties point out, these abutter calls match precisely their understanding of the boundaries of Lot B. Exhibit 25A through C. By contrast, the abutter calls do not match the Hulten Parties' proposed boundaries. For example, under the Hulten Parties' proposal, Andrew Lutzyk abuts Lot B not just to the north, but also to the east. Exhibit 96. Exhibit 59A makes no such call. The same is true for Rose Salpietro to the south (exhibit 96), Donald Minski to the north (exhibit 97), and John D'Amato to the west. Id.

The Thurlow Parties also presented additional corroborating evidence to support their reliance on the deed from Kilpatrick to Kuzzyk and Olenik. Alexander Osiper testified as someone who has lived on property abutting Lot 30 and Lot B since 1942.[11] He was the son-in-law of John Lutzyk. John Lutzyk was the nephew of

Andrew Lutzyk. Andrew Lutzyk conveyed his 100 acres more or less to his nephew, who later conveyed the property to Osiper. Osiper testified credibly that he knew Kilpatrick very well and walked the boundaries of his property with Kilpatrick to identify where the property lines were located and who the abutting landowners were. Osiper, with information he learned from Kilpatrick, helped Kilpatrick and John Lutzyk fence both the Lutzyk-Osiper property and Kilpatrick's property. They did so using railroad ties and wire fencing. Osiper testified that Kilpatrick described the border between the Shea property (Lot 30) and the Lutzyk-Osiper property by referencing a stone wall that started at the southwest corner of the Lutzyk-Osiper property and proceeded north. Exhibits 2 and 32D. This understanding is consistent with the Thurlow Parties' position regarding the boundaries of Lot 30 and Lot B, and contrary to the claim of the Hulten Parties. Osiper also testified that the eastern boundary of Lot B, as identified by Kilpatrick, was the second stone wall to the east from Lot B's western border with Salpietro. Osiper testified that he worked with Kilpatrick to place a fence along this second stone wall. Evidence established that remains of that fence are still present today.

The court found Osiper to be a very credible witness. His recall was sharp and specific. He had no interest in the outcome of the case. If anything, he seemed to identify more with the Hulten Parties, who he contacted when he thought their property was being illegally logged by a third party.[12]

The court also received as evidence tax assessor maps, which showed the boundaries of Lot 30 consistent with the claim of the Thurlow Parties. Exhibit 172. These maps showing this configuration for Lot 30 date back to the late 1960s-early 1970s. While Woodis said that such maps can be notoriously inaccurate, he nonetheless considered them, and the court cannot ignore the fact that the maps' boundaries for Lot 30 match precisely the walled lot Woodis identified through his field work.[13]

Finally, the court heard from two witnesses related to the Hulten Parties regarding the boundaries issue. Hulten herself acknowledged testifying at the original 2007 trial in the 2005 case that, for the fifty years her family owned Lots A and B, she would walk the loop trail that started on Lot A and ended on Lot B at the stone wall that the Thurlow Parties claim is the southern boundary between Lot 30 and Lot B. She testified that that was the property her family owned and used for fifty years. The court finds that this is a significant admission as to what Hulten understood as the northern boundary of Lot B. She made the admission under oath in an adversary proceeding, but before she decided to take a contrary position in the 2009 action. Hulten claimed that her 2007 testimony may have been in error

and did not have the benefit of Stefon's survey work. Neither of those claims change the fact, though, that for most of her life her understanding as to where the northern boundary of her property lies is consistent with the Thurlow Parties' claim and contrary to the position she has taken in this case.

Dieters' husband, John, also testified. He testified that he walked the property with his father-in-law, Leo Davignon, the prior owner of Lot B, and discussed the boundary lines with him. While Davignon did not know precisely where the northern boundary of Lot B was located, he described his land as extending beyond where the Thurlow Parties claim that boundary is located. The court does not give much weight to Dieters' testimony on this point for a number of reasons. First, his recounting of his conversation with Davignon was brief and vague. He did not place it in context at all. Second, Davignon's description of the property line was admittedly imprecise. Dieters explicitly stated that Davignon did not know his northern boundary. This stands in stark contrast to the testimony of Osiper regarding his conversation with Kilpatrick, which is also supported by the boundary calls in Kilpatrick's deed of Lot B to Kuzzyk and Olenik. Third, while Dieters has a pecuniary interest in the outcome of this case, Osiper had none. Consequently, to the extent that Dieters' testimony conflicts with Osiper's, the court credits Osiper's testimony. Finally, Dieters admitted to attending the first trial and hearing Hulten identify the northern boundary of Lot B as where the loop trail ended. Despite hearing this testimony, he did not testify that it was in any way incorrect or that he had a different understanding.

In addition to Dieters' testimony, the only other evidence relied upon by the Hulten Parties for their boundaries claim are the reference to twenty acres in the deeds from Finn to Shea and Finn to Kilpatrick and the incomplete mathematical description in the Finn to Kilpatrick deed that does identify a northeastern boundary beyond the boundary claimed by the Thurlow Parties.

The court attaches little weight to the call for twenty acres. The call in the Finn to Shea deed uses the words "more or less," indicating that the parties to that deed did not intend the acreage call to be precise. While the description of the twenty acre grant to the Shea brothers in the Finn to Kilpatrick deed does not say "more or less," the court attaches little weight to this fact. Reading the two deeds together, it is clear to the court that in the Kilpatrick deed, the parties were simply carving out whatever had been previously conveyed to the Shea brothers. Finn believed that to be twenty acres, so that was the shorthand he used to describe it. The subsequent deed from Kilpatrick to Kuzzyk and Olenik shows that Kilpatrick had a much more specific understanding

of the Shea grant than may have been conveyed by the language of the Finn to Kilpatrick deed.[14]

In addition, relying on the acreage call to limit Lot 30 to twenty acres, as Stefon does, results in Lot B having over thirty-seven acres. Exhibit 96. However, the Kilpatrick to Kuzzyk and Olenik deed that created Lot B described it as containing about twenty-five acres. Exhibit 59A. Consequently, relying on the acreage call in the deeds simply trades one inaccurate call for another.

In response, the Hulten Parties argue that such a result is more reasonable than the Thurlow Parties' proposal, which results in Lot B being only approximately twelve acres. This argument assumes, though, that Lot B's eastern boundary ends at the first stone wall. As noted above, Osiper testified credibly that Kilpatrick intended the eastern boundary of Lot B to be the second stone wall to the east. Doing so would increase the size of Lot B to approximately nineteen acres.[15]

Finally, both experts agree that acreage calls are the next to the last factor to consider when determining boundaries, less important than record calls, calls for surveys, natural monuments and man-made monuments. Given that Woodis was able to identify monuments (stone walls and stone piles) that laid out a boundary for the wood lot, and that boundary was corroborated by the record calls in the Kilpatrick to Kuzzyk and Olenik deed just six years after Kilpatrick acquired the property from Finn, the court attaches no weight to Finn's acreage calls in the two deeds. Similarly, the court attaches little weight to the incomplete mathematical description set forth in the deed from Finn to Kilpatrick. The Hulten Parties are correct that the description in that deed of what is being conveyed to Kilpatrick extends northerly along the stone wall that Osiper identified as his border with the Shea brothers' property. However, as noted above, the mathematical description just ends and does not connect to any other point to close the description of the property being conveyed to Kilpatrick. Consequently, it is impossible to determine the intent of Finn and Kilpatrick from this incomplete description. Simply drawing a line westerly from this point to the western boundary of Finn's property such that the Shea grant is limited to approximately twenty acres, as Stefon did, is arbitrary and ignores the substantial other evidence discussed above that shows a contrary intent.

Additional facts will be discussed as required.

III

DISCUSSION

A

Thurlow Parties' Easement Claims

The Thurlow Parties initially asserted four different

theories in support of their claim that they have an easement that runs from Gooseneck Hill Road over the Hulten Parties' property to Lot 30 and Lot 21.[16] They have since withdrawn and abandoned their express easement claim, because it is undisputed that Mrs. Bromley did not own Lot B when she granted an easement over Lot A for the benefit of Lot 21. Similarly, the Thurlow Parties have abandoned their easement by prescription claim because there is no evidence of any use of the path over Lot B by any owner of Lot 21 or Lot 30 prior to when the Thurlow Parties acquired Lot 21 in 2003. Consequently, the Thurlow Parties claim either an easement by necessity or an easement by implication. For the reasons set forth below, the court concludes that they have proved neither.

1

Easement by Necessity

An easement by necessity typically arises when a piece of property is landlocked with no direct access onto a public road. Here, there is no dispute that Lot 21 is landlocked. That fact alone is not enough to find that the Thurlow Parties are entitled to an easement by necessity over the Hulten Parties' Lot B. "One seeking an easement by necessity has the burden to prove the existence of such easement, and that the easement is reasonably necessary for the enjoyment of the land, by clear and convincing evidence. The burden of proving that an alternative mode of access is not available is also on the person claiming the easement by necessity." (Internal quotation marks omitted.) *Christensen* v. *Reed*, 105 Conn. App. 578, 589 n.11, 941 A.2d 333, cert. denied, 286 Conn. 912, 944 A.2d 982 (2008). "[T]o fulfill the element of necessity, the law may be satisfied with less than the absolute need of the party claiming the right of way. The necessity need only be a reasonable one." *Hollywyle Assn., Inc.* v. *Hollister*, 164 Conn. 389, 399, 324 A.2d 247 (1973). Furthermore, "although it is true that [a]n easement of necessity may occur when a parcel has become landlocked from outside access such that the owner would have no reasonable means of ingress or egress except over lands promised by another and a right-of-way is necessary for the enjoyment of the parcel . . . [t]he inverse also is true; that is, a common-law right-of-way based on necessity expires when the owner of the dominant estate acquires access to a public or private road through another means." (Internal quotation marks omitted.) *Christensen* v. *Reed*, supra, 583–84.

Finally, the clear and convincing burden requires the presentation of "clear, precise and unequivocal evidence." (Internal quotation marks omitted.) *J. Frederick Scholes Agency* v. *Mitchell*, 191 Conn. 353, 358, 464 A.2d 795 (1983). The standard is met "if the evidence induces in the mind of the trier a reasonable belief that the facts asserted are highly probably true, that the

probability that they are true or exist is substantially greater than the probability that they are false or do not exist." (Internal quotation marks omitted.) *Lopinto* v. *Haines*, 185 Conn. 527, 534, 441 A.2d 151 (1981). Put another way, the clear and convincing standard should "operate as a weighty caution upon the minds of all judges, and it forbids relief whenever the evidence is loose, equivocal or contradictory." (Internal quotation marks omitted.) Id., 539.

Here, the Thurlow Parties have failed to establish reasonable necessity by clear and convincing evidence. The evidence showed that the path that runs from Lot 21 north to Phinney Lane is at least as suitable an access to Lot 21 as is the path south to Gooseneck Hill Road. The pictures submitted by the Hulten Parties (exhibit 153 C), taken in the spring of 2013, show a wide, easily passable way, wide enough for a truck or tractor. The court's observations of the path in June of this year were the same. In fact, having walked both the path from Gooseneck Hill Road to Lot 21 and the path from Lot 21 to Phinney Lane, the court is unable to understand the Thurlow Parties' claim of necessity. This is particularly true given that Denning admitted hauling timber from Lot 21 and abutting lots over the path to Phinney Lane.[17] Given the evidence to the contrary, the court does not credit Denning's claim that the path to Phinney Lane is often too wet to pass and requires the construction of temporary structures. The Thurlow Parties submitted no corroborating evidence for Denning's testimony or other evidence to contradict the photographs submitted by the Hulten Parties or the court's actual observations. Similarly, the Thurlow Parties submitted no evidence to support their claim that they would need permits to construct temporary structures to take the path out to Phinney Lane or that those permits would be difficult to obtain.

In addition, because they now own Lot 30, the Thurlow Parties have not established necessity because they may very well have express access to Lot 21 via the right-of-way Finn granted to the Shea brothers in exhibit 29. As noted above, Woodis reasonably concluded that the right-of-way set forth in that deed was intended to provide the Shea brothers with access to Lot 30 by crossing the property Finn owned to the east of Lot 30 out to Route 169. Exhibit 2 shows the location of the path across the property Finn owned at the time. It is true that exhibit 2 shows the path crossing from Lot 30 over the southwest corner of the Lutzyk-Osiper property before going back onto the property owned at the time by Finn. It is also true that Osiper testified definitively that neither he nor his father-in-law or his uncle ever granted a right-of-way across his property. Nevertheless, the evidence established that Finn granted the Shea brothers a right-of-way across his property, which included what is today Lot B, to gain access from Route 169. Thus, because the Thurlow Par-

ties own both Lot 21 and Lot 30 they may no longer require an easement by necessity because the root deed to Lot 30 from Finn to Shea gives them an express right to access Lot 30, and thereby Lot 21 from Route 169.

The Thurlow Parties argue that the court should give no consideration to this path because it goes through wetlands and is not passable. This argument ignores the fact, though, that the evidence establishes that they have an express right to use this path. With such a right they also have a right to maintain the easement for its intended purpose. *Labbadia* v. *Bailey*, 147 Conn. 82, 89, 157 A.2d 237 (1959). The Thurlow Parties presented no evidence that the path to Route 169 could not be maintained to make it passable.

Nevertheless, the court cannot definitively determine the Thurlow Parties' rights in the path to Route 169 for at least two reasons. First, the parties presented little evidence of the scope of the right-of-way. The reference in the deed from Finn to the Shea brothers describing Lot 30 as a "wood lot with all cut wood and timber thereon," as well as the evidence that the Shea brothers were in the timber or logging business, do suggest that the right-of-way was intended to permit the Shea brothers to remove timber along the path. However, the parties never joined issue on the scope of the right-of-way because no claims have been made to it in either of these cases. Second, for the court to determine what rights the Thurlow Parties have in the right-of-way, the owners of the property between Lot 30 and Route 169 would need to be joined as parties because their rights to use their properties would be affected.

The uncertainty of the Thurlow Parties' rights to use the path from Lot 30 to Route 169 does not aid them in their easement by necessity claim. To the contrary, it is their burden to prove that there are no reasonable alternatives to access except from the easement they seek. The possibility of access from an express right-of-way from Route 169 to Lot 30 is a possible reasonable alternative that the Thurlow Parties have not proven by clear and convincing evidence is not available to them.

For the above reasons, the Thurlow Parties' claim to an easement by necessity is rejected.

2

Easement by Implication

The court must consider two principal elements to determine whether an easement by implication exists: "(1) the intention of the parties, and (2) if the easement is reasonably necessary for the use and normal enjoyment of the dominant estate." *Utay* v. *G.C.S. Realty, LLC*, 72 Conn. App. 630, 637, 806 A.2d 573 (2002). "The intent of the grantor to create an easement may be inferred from an examination of the deed, maps and recorded instruments introduced as evidence. . . . A court will recognize the expressed intention of the par-

ties to a deed or other conveyance and construe it to effectuate the intent of the parties. . . . In doing so, it always is permissible to consider the circumstances of the parties connected with the transaction. . . . Thus, if the meaning of the language contained in a deed or conveyance is not clear, the court is bound to consider any relevant extrinsic evidence presented by the parties for the purpose of clarifying the ambiguity." (Citations omitted.) Id.

Here, the Thurlow Parties allege in their Fourth Counterclaim in the 2009 action that "[the Hulten Parties'] predecessors in title, Mrs. George Bromley, Adm. of the Estate of Joseph Farnum, and E. LaVerne Kilpatrick, each intended that an easement or right-of-way should exist upon the [Hulten Parties'] Property for purposes including access to and egress from the [Thurlow Parties'] Property, and subsequent owners of the [Hulten Parties'] Property intended that the easement of right should continue for the same purpose." Amended Revised Counterclaims (#244), Fourth Counterclaim, ¶ 4.

There is no question that Mrs. Bromley so intended. In fact, she explicitly said so in her grant to Tillinghast. Exhibit 70. That intent only gets the Thurlow Parties as far as the boundary of Lot A, though, because that is all that Mrs. Bromley owned at the time of her grant in 1903. What she intended beyond Lot A is therefore irrelevant, as she had no authority to grant an easement, whether expressed or by implication, over land then owned by Finn.

There is no evidence that Kilpatrick ever intended to grant an easement for the benefit of Lot 21 or Lot 30 over Lot B, either when he owned it or transferred it to Kuzzyk and Olenik. Kilpatrick never owned Lot 21 or Lot 30. In addition, unlike Mrs. Bromley, he never granted in any documents a right to pass from Lot A over Lot B for the purpose of getting to Lot 21 or Lot 30. Nor did his deed from Finn of all of the Ensworth Farm except what was granted to the Shea brothers make any reference to Lot 21. Exhibit 46G. And, although that deed did make reference to the grant to Shea (Lot 30), it does not include any reference to a right-of-way across Lot B. Furthermore, Kilpatrick's conveyance of Lot B to Kuzzyk and Olenik makes no reference whatsoever to Lot 21 or access to it. Exhibit 59A. None of the deeds make reference to any deed, map or plan that shows the existence of an easement to Lot 21. Certainly, if Kilpatrick (or Finn before him) intended to convey an easement across Lot B for the benefit of Lot 21 or Lot 30, they could have done so by referencing the deed from Mrs. Bromley to Tillinghast. They did not. Overall, the deeds relating to Lot B are unambiguous in that they express no intent to extend an easement running from Gooseneck Hill Road, over Lot A and through Lot B for the benefit of Lots 21 and 30.

The lack of evidence of intent here is similar to that in *Utay*. In that case, there was no reference in the deed to an easement, nor to any map or other instrument from which an intent to create an easement could be inferred. Consequently, the Appellate Court concluded that "the grantor did not intend to create an easement by implication over the defendant's land when he conveyed the property to the plaintiff. Accordingly, there is no need to consider extrinsic evidence of such an intention." *Utay* v. *G.C.S. Realty, LLC*, supra, 72 Conn. App. 637–38. The court went on to note that "the use of intent to find an implied easement long has been disfavored in Connecticut, largely because of the obvious statute of frauds problem, but also because the practical impact is to make land records less reliable. . . . Consequently, implied grants of any interest in land are allowed to a very much more limited extent [in Connecticut] than in many other states." (Citations omitted; internal quotation marks omitted.) Id., 638 n.9.

The Thurlow Parties attempt to avoid this result by pointing to the right-of-way language in the deed from Finn to the Shea brothers relating to Lot 30. Exhibit 29. They argue that the reference to "the right-of-way to and from said land as the path now runs" refers to the path that ran from Gooseneck Hill Road to Lot 21. The problem with this argument is that their expert, Woodis, does not believe that the right-of-way refers to that path. Instead, Woodis testified that he believes the reference is more reasonably understood as referring to the path to the east to Route 169. Exhibit 2. For the reasons discussed above, the court agrees with Woodis. Consequently, the reference in the deed from Finn to Shea is not evidence of an intention to create an easement or right-of-way south to Gooseneck Hill Road.

The only other evidence the Thurlow Parties rely upon is the fact that the path has existed in its current state since at least 1934. This fact, though, cannot, in the absence of some evidence in the deeds, be used to prove that any owner of Lot B ever intended to create an easement over that parcel for the benefit of Lot 21 or Lot 30. Furthermore, the existence of such a path is as consistent with use by the owners of Lot B as it is with use by the owners of Lots 21 and 30. The Thurlow Parties have simply failed to prove the first element of an easement by implication.

Nor have they proved the second element—that the easement is reasonably necessary to the use and enjoyment of their property. In evaluating the reasonably necessary factor, the Appellate Court has stated that the claimant must prove that "the easement is highly convenient and beneficial for the enjoyment of the dominant estate." (Internal quotation marks omitted.) *Sanders* v. *Dias*, 108 Conn. App. 283, 294, 947 A.2d 1026 (2008). Put another way, "[a]n easement by implication does not arise by mere convenience or economy, but

exists because of some significant or unreasonable burden as to access that demands the easement's presence." (Internal quotation marks omitted.) *Utay* v. *G.C.S. Realty, LLC*, supra, 72 Conn. App. 638.

As noted above, the Thurlow Parties have not proven that it is highly more convenient for them to access Lot 21 and Lot 30 from Gooseneck Hill Road than it is to access those lots from the path running north to Phinney Lane. Similarly, they have not offered any evidence as to the cost and effort involved in maintaining the express right-of-way Finn granted to the Shea brothers in exhibit 29 that appears to use the path to Route 169.

For the foregoing reasons, the Thurlow Parties have failed to prove an easement by implication across Lot B. The evidence is clear that they have an express easement from Gooseneck Hill Road to the boundary of Lot A and Lot B as depicted on exhibit 159. Exhibit 70. Furthermore, the court finds that the easement is the easterly of the two paths depicted on exhibit 159. Exhibit 2. The Thurlow Parties, though, have proven no right to go farther on that path than the boundary between Lots A and B. Given this conclusion, the court need not consider the scope of the easement from Gooseneck Hill Road across Lot A, as the easement is of little value for any purpose without the right to continue onto Lot B.[18]

B

Boundaries of Lot B and Lot 30

The parties have submitted competing descriptions of the boundaries for Lot B and Lot 30. The Hulten Parties rely upon the conclusions of Stefon as set forth in exhibit 159. The Thurlow Parties rely upon the conclusions of Woodis as set forth in exhibit 2.

In an action to quiet title to lands and to determine boundaries between parties, "[w]here the testimony of witnesses as to the location of the land described in deeds is in conflict, it becomes a question of fact for the determination of the court which may rely upon the opinions of experts to resolve the problem and it is the court's duty to accept that testimony or evidence which appears more credible." (Internal quotation marks omitted.) *Har* v. *Boreiko*, 118 Conn. App. 787, 796, 986 A.2d 1072 (2010). Where, as here, the deeds at issue are ambiguous, "the intention of the parties is a decisive question of fact. . . . In ascertaining the intention of the parties, it [is] proper for the trial court to consider the surrounding circumstances." (Citations omitted; internal quotation marks omitted.) *Koennicke* v. *Maiorano*, 43 Conn. App. 1, 10, 682 A.2d 1046 (1996). "Thus, if the meaning of the language contained in a deed or conveyance is not clear, the trial court is bound to consider any relevant extrinsic evidence presented by the parties for the purpose of clarifying the ambiguity." *Lakeview Associates* v. *Woodlake Master Condo-*

*minium Assn.*, *Inc.*, 239 Conn. 769, 780–81, 687 A.2d 1270 (1997).

The parties have relied upon a variety of extrinsic evidence in support of their respective positions. Fortunately, our Supreme Court has provided some guidance on the weight to be given such evidence. First, "[w]here the boundaries of land are described by known and fixed monuments which are definite and certain, the monuments will prevail over courses and distances." (Internal quotation marks omitted.) *Velsmid* v. *Nelson*, 175 Conn. 221, 227, 397 A.2d 113 (1978). "A monument is only controlling, however, if it is referred to in the deed." (Internal quotation marks omitted.) *Chebro* v. *Audette*, Superior Court, judicial district of Windham at Putnam, Docket No. CV-09-5004630 S (September 23, 2010) (50 Conn. L. Rptr. 690, 693) (*Riley*, *J.*), aff'd, 138 Conn. App. 278, 50 A.3d 978 (2012). On the other end of the spectrum, "[t]he general rule is that the designated quantity of land called for, here acreage, is the least reliable aspect of the description determining the intent by the parties. See *Texas Eastern Transmission* [*Corp.*] v. *McCrate*, 76 Ill. App. 3d 828, 395 N.E.2d 624 (1979); *Erickson* v. *Wick*, 22 Wash. App. 433, 591 P.2d 804 (1979); J. Backman & D. Thomas, A Practical Guide to Disputes Between Adjoining Landowners—Easements (1990) § 8.02; 12 Am. Jur. 2d, Boundaries § 75." *Koennicke* v. *Maiorano*, supra, 43 Conn. App. 10–11.

The problem for the court here is that none of the evidence submitted by the parties is clear or definitive. The deed from Finn to Shea, which created Lot 30, does not explicitly identify any monuments. Exhibit 29. It does make a reference to a "wood lot." Both experts agree that it is reasonable to conclude that such a reference was meant to identify a closed area. Yet, the deed does not identify the monuments that closed the area. The deed does make reference to abutting property owners, but those calls are imprecise and inaccurate, no matter where one tries to set Lot 30. The deed also makes an approximate acreage call, but, as noted above, using this acreage call as a basis for drawing the boundary lines for Lot 30 results in inaccurate acreage calls in the deeds for abutting properties. Similarly, the deed from Finn to Kilpatrick, which conveyed everything Finn had not conveyed to the Shea brothers, describes the conveyance by an incomplete mathematical description.

Weighing all of the evidence, though, and for the reasons set forth above, the court concludes that the extrinsic evidence establishes that Woodis' conclusion is more reasonable, more logical and more credible. Although not called out in the deed from Finn to Shea, Woodis was able to locate monuments—stone walls and stone piles—that set forth the boundaries of a wood lot. His conclusion as to those boundaries was corroborated by other evidence, including exhibit 59A, Osiper's

testimony, Hulten's testimony, and tax assessor maps.

By contrast, Stefon ignored clear evidence of what one of the key parties—Kilpatrick—intended by giving no weight to the abutter calls in the deed from Kilpatrick to Kuzzyk and Olenik that created Lot B, or the testimony of Osiper regarding what Kilpatrick understood to be the property lines for Lot B and Lot 30. Stefon also ignored Hulten's belief for virtually all of her life, until she asserted her claim in the 2009 action, that the boundary for Lot B ends where Woodis says it does.

Instead, Stefon relied upon an incomplete mathematical description and a clearly imprecise acreage call. Furthermore, he then drew a somewhat arbitrary line to create what he believes is the Lot 30 Finn and the Shea brothers intended to create in 1918. Exhibit 29. Yet, his Lot 30 does not result in better matching abutter calls for Lot 30, results in incorrect abutter calls for Lot B, and creates an acreage disparity in the deed for Lot B. The court found Stefon's conclusions neither reasonable nor credible.

For all of these reasons, the court concludes that the boundaries for Lot 30 are accurately set forth in exhibit 2. It further finds that the northern boundary for Lot B ends at the southern boundary of Lot 30 on exhibit 2. The southern boundary of Lot B is depicted on exhibit 159 where the fourth tract (Lot B) is shown to border the second tract (Lot A).

IV

CONCLUSION

Based on the conclusions set forth above, the court enters judgment as follows. In the 2005 action, judgment on the First Count of the September 17, 2013 Amended Substitute Complaint shall enter for the plaintiffs as to an express easement to use the path as depicted on exhibit 159 from Gooseneck Hill Road to the boundary between the second tract (Lot A) and the fourth tract (Lot B).[19] To the extent the plaintiffs are claiming that they have an easement from the northern border of Lot A across Lot B, to its northern border with Lot 30, judgment shall enter for the defendants. As to the Fourth Count seeking an injunction, judgment shall enter for the defendants because the defendants have the right to block access to Lot B. To the extent they also blocked access to Lot A, the court can see no harm to the plaintiffs, irreparable or otherwise, given that they have failed to prove that they have any right to traverse Lot B. As to the Fifth Count, judgment shall enter for the defendants because the plaintiffs have failed to prove that they had an exclusive possessory interest in the easement across Lot A. As to the Sixth, Seventh, Eighth and Ninth Counts, judgment shall enter for the defendants because the plaintiffs have failed to prove a right to access their property through Lot B. Consequently, the defendants' actions in blocking

access to Lot B were not tortious. To the extent that the defendants blocked access to Lot A, the plaintiffs can prove no damages because they had no right to cross from Lot A to Lot B.

In the 2009 action, judgment on Count One of the Third Amended Complaint shall enter for the plaintiffs. The defendants' easement over Lot A ends at the northern boundary between Lot A and Lot B. As to Count Two, judgment shall enter for the defendants, as the court does not see the need for a permanent injunction. The court has no reason to believe that the defendants will not abide by the judgment of the court now that their rights have finally been adjudicated. As to Count Three, judgment shall enter for the defendants. The northern boundary for Lot B and the boundaries for Lot 30 are as set forth on exhibit 2. As to Count Four, judgment shall enter for the defendants because the logging done by the defendants occurred on their property.

As to the defendants' Amended Revised Counterclaims in the 2009 action, judgment shall enter for plaintiffs. The defendants failed to prove an easement by necessity or implication.

* Affirmed. *Thurlow* v. *Hulten*, 173 Conn. App.    ,    A.3d    (2017).

[1] The Thurlow Parties withdrew their Second and Third Counts, which sought rights based upon a claim of a prescriptive easement.

[2] While the parties disagree over the boundaries of Lot 30, because it abuts what the Hulten Parties call their Lot B, and the parties disagree as to where the boundary is between Lot B and Lot 30, the parties nonetheless agree that the northern boundary of Lot 30 abuts the southern boundary of Lot 21.

[3] Between 1903 and 2003, Lot 21 was conveyed a number of times. Exhibits 71 through 76. With one exception, each of these conveyances made reference to the right-of-way described in exhibit 70. The only exception was a 1926 probate deed from the estate of Helen Tillinghast to her mother, Mary Tillinghast. Exhibit 73. The right-of-way language was picked up in the next deed in 1938 from Mary Tillinghast to Louise T. Ellsworth. Exhibit 74. The Hulten Parties do not argue that the missing right-of-way language in the probate deed somehow extinguishes Mrs. Bromley's earlier grant. Nor could they, as the right-of-way language was clearly a matter of record when they acquired Lot A.

[4] Because the Thurlow Parties now own Lot 30, they would only need to acquire or prove the existence of some right to get from Lot A, through Lot B, to Lot 30.

[5] In the notes on exhibit 159, the Hulten Parties' expert, Stefon, identifies the eastern path as the possible location of the right-of-way. However, he does not identify the western path as such.

[6] Denning later testified that a permanent bridge is now in place, eliminating a need for a temporary bridge in the future.

[7] The court heard little evidence regarding access to Lot 21 from Lisbon Road to the east. Denning testified that three wetlands have to be crossed between Lot 21 and Lisbon Road. The Hulten Parties offered no evidence to the contrary. Consequently, the court finds that access from Lisbon Road to Lot 21 is not practicably feasible.

[8] On January 6, 1993, Davignon signed a second quitclaim deed conveying the same five tracts to the Hulten Parties. Exhibit 66. The reason she did so is unclear. In any event, the description of the Fourth Tract in both deeds is exactly the same.

[9] A rod is a unit of measurement equal to 16.5 feet.

[10] Stefon also testified that it was reasonable to assume that the reference to a "wood lot" was meant to identify a defined area.

[11] Woodis' opinion as to the boundaries of Lot 30 and Lot B also relied on Osiper's testimony. The Standards for Surveys and Maps in the State of Connecticut make clear that under circumstances like those here, it is

appropriate to do so. Section 300b-17 (b) provides in relevant part: "Where properties are poorly described or where the location of the boundaries have become lost or uncertain, the surveyor may contact adjacent owners or other persons for their knowledge as to the locations of boundary lines." Exhibit 157, p. 12.

[12] It was unclear whether that third party was one of the Thurlow Parties.

[13] The Standards for Surveys and Maps in the State of Connecticut require that a land records search for determining boundary lines shall include "an examination of tax assessor's plats and records." Exhibit 157, § 20-300b-16 (a) (4).

[14] Attempting to diminish the significance of the deed from Kilpatrick to Kuzzyk and Olenik, Stefon testified that he believes that Kilpatrick just did not understand what he bought from Finn. There is no evidence to support this claim. In fact, as exhibit 59A and the testimony of Osiper make clear, Kilpatrick always maintained the same firm and definitive view of what he owned.

[15] Extending Lot B farther east would call into question the eastern boundary between the Hulten Parties and Brian Burchman. Exhibit 97. The court raised this issue during trial and asked whether Burchman needed to be added as a party to the action. The Hulten Parties ultimately represented to the court that they were making no claim to Burchman's property, even if they had the right to do so. They did so despite knowing Osiper's testimony. Based on that representation, the court went forward with the trial without Burchman.

[16] As noted above, although Lot 30 lies in between Lot B and Lot 21, because the Thurlow Parties now own Lot 30, they only need to prove an easement over Lot B.

[17] Denning identified the wood hauled as firewood or "pole wood."

[18] The fact that the easement across only Lot A is of little value to the owner of Lot 21 does raise a question as to why Tillinghast would bother acquiring it in 1903 if he did not already have rights beyond Lot A. Unfortunately for the Thurlow Parties, they never presented evidence answering this question. It may have been that Tillinghast intended to acquire other rights after he acquired the right-of-way from Mrs. Bromley, but never did.

[19] To be clear, exhibit 159 does not accurately represent Lot B as determined by the court. Nevertheless, the southern boundary for Lot B on exhibit 159 does accurately represent the boundary between Lot A and Lot B.

———————————————