******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

## MARY GLEASON ET AL. *v.* PAUL ATKINS
## (AC 46321)

Bright, C. J., and Moll and Clark, Js.

*Syllabus*

The plaintiffs appealed to this court from the judgment of the trial court rendered for the defendant in the plaintiffs' action to quiet title to a certain strip of land to the south of Lake Waramaug in New Preston and to obtain damages for trespass. The property of the plaintiffs and the property of the defendant were both part of a subdivision of a parcel of land created by way of an approved subdivision map filed in 1969 and subsequently revised in 1970. In 1971, the owners of the subdivided land conveyed Lot #3 as shown on the 1970 subdivision map to P by warranty deed. That deed contained a description of Lot #3, which did not include any frontage on Lake Waramaug. The deed also contained language granting the exclusive right to use, "in common with owner or owners of Lots #1, #2, #4 and #5 as shown on [the 1970 subdivision map], a certain piece or parcel of land situated on the shore of Lake Waramaug and also shown on said map . . . ." The grantee and the other owners entitled to use the lakefront premises were required to maintain the premises and to pay their pro-rata share of taxes that accrue on the lakefront premises. V owned a lot immediately adjacent to the easterly boundary of the lakefront premises and, as depicted on the 1970 subdivision map, the southerly boundary of V's lot was the edge of the unpaved portion of West Shore Road. West Shore Road contained a paved way of approximately twenty-five feet in width with unpaved unimproved shoulders approximately 12.5 feet in width on each side of the pavement. The chain of title for Lot #3 and the exclusive right to the use of the lakefront premises ultimately led from P's deed to a warranty deed to the plaintiffs using the same descriptions of both parcels as contained in P's deed. The defendant acquired Lot #10 of the subdivision by warranty deed. Lot #10 was a contiguous parcel encompassing land on either side of West Shore Road, including the lakefront premises and the strip of land abutting the southerly boundary of V's property and West Shore Road itself. The defendant's deed stated that the conveyance of Lot #10 was subject to the rights of others to use the lakefront premises. The unpaved shoulders of the road were not shown on the 1970 subdivision map in the area where the lakefront premises were situated, although the shoulder was shown to the south of V's lot and at other places on the map. The state of Connecticut did not own the fee interest in the improved or unimproved portion of the public highway easement, but the general public maintained a right-of-way over the improved and unimproved portions of West Shore Road pursuant to the state's highway easement. The defendant, with the

approval of the state, constructed a three foot high picket fence approximately in the middle of the northerly unpaved shoulder of West Shore Road. The fence was located on the defendant's property within the state's highway easement. Several years later, with the approval of the state, the defendant planted a hedge along the northerly side of the picket fence. As a result, a dispute arose between the plaintiffs and the defendant as to the exact location of the southerly boundary of the lakefront premises. The plaintiffs alleged that the picket fence and hedge had been installed on the lakefront premises, over which they claimed to have exclusive use rights, and that such action constituted trespass. At the trial before the court, the plaintiffs argued that the language of P's deed should be interpreted so that the words "the state highway known as West Shore Road," describing the southerly boundary of the lakefront premises, meant only the paved portion of the entire highway easement. In support of their position, the plaintiffs offered factual evidence from the defendant's disclosed expert surveyor, N, who had drawn a map showing the defendant's property, including the lakefront premises. The defendant argued that the plain language of the description of the lakefront premises in P's deed was clear and did not include the shoulder of the road. In support of this argument, the defendant relied on the testimony of N about the boundaries of the lakefront premises. N testified that he was able to determine with a reasonable degree of scientific certainty that the fence and hedgerow were not located within the lakefront premises. N opined that that the lakefront premises ended at the highway easement line, at the edge of the unpaved shoulder of West Shore Road. He testified that the location of the highway on the 1970 subdivision map was consistent with its location on his survey map, except that the 1970 subdivision map appeared to show only the paved road and not the highway easement line. The court credited, in particular, N's testimony that he found a vehicle axle in the northerly line of the state's highway easement and that sometimes a small vehicle axle is used for noting property corners. N explained that, when marking property boundaries near a state highway, surveyors place markers along the edges of the highway easement, but they would place a marker within the state's highway easement if there was an easement within the property of the highway for some other purpose. According to the survey map, N concluded that, in this case, the vehicle axle in the northerly line of the highway easement marked both the southwestern corner of the lakefront premises and the northerly boundary of the highway easement. Following trial, the court issued a memorandum of decision, concluding that the words "the state highway known as West Shore Road" as used in P's deed meant the entire easement held by the state and not just the paved portion. The court also rejected the plaintiffs' alternative argument that their right to exclusive use was the equivalent of a fee simple title that entitled them to a rebuttable presumption that they owned to the center of West Shore Road and

concluded, on the basis of the plain language of P's deed, that the grantors' intention was to have the lakefront premises remain as part of Lot #10 subject to the plaintiffs' right of exclusive use. *Held*:

1. The plaintiffs could not prevail on their claim that the language in P's deed describing the boundaries of the lakefront premises, when considered with the 1970 subdivision map referenced therein, was unambiguous and that, therefore, the legal interpretation of the location of the southerly boundary of the lakefront premises was a legal question for this court subject to plenary review: this court concluded that P's deed was ambiguous as to the meaning of the phrase "the state highway known as West Shore Road" that defined the southerly boundary of the lakefront premises because, although the 1970 subdivision map showed three physical monuments referenced in P's deed, namely Lake Waramaug, West Shore Road, and V's lot, it did not include the boundaries of the lakefront premises because the 1970 subdivision map was prepared prior to the creation of the lakefront premises, and, given the depiction of the boundaries of V's lot on the 1970 subdivision map and the fact that the lakefront premises were not separately defined on that map, it was unclear based on P's deed and the map referenced therein whether the parties to P's deed intended that "the state highway known as West Shore Road" would refer to only the paved portion of the highway depicted on the map, such that the lakefront premises extended to the edge of the paved road, or to the entirety of the state's highway easement, including both the paved and unpaved portions, such that, like V's lot shown on the 1970 subdivision map, the lakefront premises extended only to the edge of the unpaved shoulder; moreover, because both interpretations were reasonable based on P's deed and the incorporated 1970 subdivision map, P's deed was ambiguous and, accordingly, the trial court properly considered extrinsic evidence to resolve the ambiguity.

2. The plaintiffs could not prevail on their argument that, because P's deed described the lakefront premises as abutting the public highway and because their interest in the lakefront premises was akin to fee simple, they were entitled to the rebuttable presumption that the lakefront premises ran to the center of the paved portion of the highway: it was clear from the plain language of P's deed that the grantor intended to convey only an easement over the lakefront premises rather than an unlimited interest akin to fee simple title, and the Supreme Court has interpreted almost identical language as conveying an easement; moreover, although the plaintiffs described their right to use and possess the property as unlimited, the plaintiffs' use was in fact subject to several restrictions, including that the plaintiffs' use of the property was limited to their private use, the plaintiffs were limited to only one dock and one float, they were prohibited from placing any fence or building on the lakefront premises, and the plaintiffs were required to pay their pro-rata share of taxes that accrued on the lakefront premises, with the

failure to pay such taxes acting as a termination of the plaintiffs' right to use, and such limitations, and the possibility that the plaintiffs' use would terminate if they failed to pay taxes, was inconsistent with the grant of a whole or unlimited interest embracing all the elements of complete ownership; accordingly, the plaintiffs were therefore not entitled to the presumption of ownership to the center line of West Shore Road.

3. The plaintiffs could not prevail on their claim that the trial court's finding that the southerly boundary of the lakefront premises ended at the highway easement was clearly erroneous for three separate reasons:

a. The trial court's conclusion that, if the lakefront premises extended to the edge of the paved road, the southerly boundary of the lakefront premises would not close with the westerly boundary of V's lot was not clearly erroneous: there was ample evidence in the record to support the court's finding that V's lot extended only to the unpaved shoulder of West Shore Road, as opposed to the paved edge of the road, as the 1970 subdivision map incorporated into P's deed clearly depicted V's lot as extending to a point short of the paved road, the court was entitled to rely on this map feature as though it were expressly recited in P's deed, N testified that he found an iron pin in the southwestern corner of V's lot, coinciding with the highway easement line, and N's survey map depicted V's lot as extending only to the location of that iron pin at the unpaved shoulder of the highway; moreover, although the plaintiffs' argument that the iron pin at the corner of V's lot and the southerly boundary line of V's lot shown on the 1970 subdivision map did not mark the boundaries of that lot but instead merely designated the location of the highway easement line was one possible interpretation of the 1970 subdivision map and the existence of the iron pin, it was not the only one, and the plaintiffs offered little evidence in support of their argument and ignored the fact that the court had evidence to the contrary, including what appeared to be clearly drawn property boundaries of V's lot on the 1970 subdivision map and N's unrebutted survey map and testimony; furthermore, to the extent that the plaintiffs challenged the court's reliance on the vehicle axle that N found in the southwestern corner of the lakefront premises, this court rejected that argument for the same reason; additionally, although the plaintiffs argued that the deed for V's lot stated that V's lot was bounded southerly by the highway, and there is a rebuttable presumption that, when a deed contains such a description, the landowner owns the fee to the center of the highway, the court was entitled to disregard that presumption and instead credit the evidence supporting a contrary conclusion.

b. The trial court's conclusion that the boundaries of the lakefront premises closed at the southwestern corner of V's lot only when the court adopted the defendant's position was supported by the record and was not clearly erroneous: given that P's deed described the lakefront premises as both beginning and ending at V's lot, the court properly relied

on the boundaries of that lot as shown on the 1970 subdivision map; moreover, because accepting the plaintiffs' interpretation of P's deed that the southerly boundary of the lakefront premises was the paved portion of West Shore Road would mean that there would be a 12.5 foot gap between the southwestern corner of V's property and the southeastern corner of the lakefront premises, this court could not say that it was unreasonable for the trial court to reject the plaintiffs' interpretation in favor of one that both resulted in a closed plot of land and gave effect to all of the monuments called out in P's deed; furthermore, the court credited N's testimony and survey map, which indicated that the southerly boundary of the lakefront premises extended only to the unpaved shoulder of the highway and closed with the westerly boundary of V's lot and, to the extent that the plaintiffs challenged N's survey method, N's survey properly tracked the monuments referred to in P's deed, which he identified and located by reference to the vehicle axles and iron pins in the field; additionally, the trial court found that N was highly credible and rejected the plaintiffs' arguments challenging his testimony, and this court would not second-guess those determinations on appeal.

c. The plaintiffs' argument that there was no legal or logical basis for the trial court's conclusion that the strip of land south of V's lot would be useless to the grantors unless they also retained the unpaved shoulder abutting the lakefront premises was unavailing; the unpaved shoulder of the highway abutting V's lot, although perhaps not entirely useless to the grantors if they did not own the unpaved shoulder abutting the lakefront premises, would nonetheless have had more value to the grantors if they also retained ownership of the neighboring strip of land, and the court reasonably inferred on the basis of the evidence that the grantors' intention to retain ownership of the unpaved shoulder abutting V's lot, which was apparent from the 1970 subdivision map, made it more likely that they also intended to retain ownership of the unpaved shoulder abutting the lakefront premises so as to retain for themselves a single contiguous parcel subject only to the public right-of-way over the highway, and this court could not say that the inferences drawn by the trial court in reaching its conclusion were either unreasonable or illogical.

4. The plaintiffs' argument that any ambiguity as to the location of the southerly boundary of the lakefront premises must be construed against the grantor and not the grantee was unavailing: although it is true that ambiguous language in a grant is ordinarily construed against the grantor and in favor of the grantee, the trial court was not required to apply that principle in this case because that rule is one of last resort, and courts have applied the principle advanced by the plaintiffs only where the evidence already favored construing the deed in the grantee's favor or when, even after considering extrinsic evidence and other rules of construction, doubt remained as to the intention of the parties to an ambiguous deed such that the ambiguity was irreconcilable; moreover,

in the present case, the court properly considered extrinsic evidence to resolve the ambiguity and determine the intent of the parties to P's deed and, because the court was able to resolve the ambiguity on the basis of that evidence, it was unnecessary for the court to resort to the rule advanced by the plaintiffs.

Argued January 17—officially released June 4, 2024

*Procedural History*

Action, inter alia, seeking to quiet title to certain real property, and for other relief, brought to the Superior Court in the judicial district of Litchfield and tried to the court, *Hon. John W. Pickard*, judge trial referee; judgment for the defendant, from which the plaintiffs appealed to this court. *Affirmed.*

*Kenneth R. Slater, Jr.*, for the appellants (plaintiffs).

*Jonathan B. Nelson*, with whom was *Venesha White*, for the appellee (defendant).

*Opinion*

BRIGHT, C. J. The plaintiffs, Mary Gleason and Keavy Ann Gleason, appeal from the judgment of the trial court rendered in favor of the defendant, Paul Atkins, in the plaintiffs' action to quiet title to a strip of land in the town of New Preston and to obtain damages for trespass. The disputed strip of land is the unpaved shoulder of a public highway, which extends across the defendant's property and lies to the south of a lakefront parcel (lakefront premises) that the plaintiffs have the exclusive right to use in common with other property owners who are not parties to this action. On appeal, the plaintiffs claim that the court improperly concluded that the lakefront premises is bounded by the unpaved shoulder rather than the paved portion of the highway. We disagree and, accordingly, affirm the judgment of the trial court.

The court's memorandum of decision sets forth the following facts and procedural history. "The property

of the plaintiffs and the property of the defendant were both part of a subdivision of a parcel of land created by Thomas F. and Marian Quinlan (Quinlan land). The Quinlan land was divided into building lots by way of an approved subdivision map filed on November 12, 1969, and subsequently revised on August 16, 1970, by a new subdivision map (1970 subdivision map). [See appendix to this opinion.] The 1970 subdivision map, as well as [each] of the other relevant maps in this case, was drawn by Charles F. Osborne Associates.

"In 1971, Thomas F. and Marian Quinlan conveyed Lot #3 as shown on the 1970 subdivision map to Bonnie J. Peoples by warranty deed (Peoples deed). That deed contained a description of Lot #3, which does not include any frontage on Lake Waramaug. However, the deed also contained the following language (exclusive use language):

" 'Together with the exclusive right to use, in common with owner or owners of Lots #1, #2, #4 and #5 as shown on [the 1970 subdivision map], a certain piece or parcel of land situated on the shore of Lake Waramaug and also shown on said map, running in a westerly direction for a distance of 125 feet from the land of Nancy Velardi along the shore of Lake Waramaug, thence running in a southerly direction for a distance of about 90 feet to the state highway known as West Shore Road, thence running in an easterly direction along said highway for a distance of about 125 feet to land of Nancy Velardi.

" 'Said use to be limited to the private use of grantee and friends with no commercial activities to be conducted thereon and also limited in that only one dock and one float be permitted and that no fence or building, permanent or otherwise, be permitted on said parcel.

" 'The grantee and other owners entitled to use of aforesaid lake-front premises shall maintain said premises as their sole cost and expense and shall assume all

responsibilities as to any damage or injuries sustained thereon.

" 'The grantee and other owners of Lots #1 through #5 shall pay their pro-rata share of taxes that accrue on said lakefront premises and such tax payments shall be paid during July of each year. Failure to pay the proportionate share of said taxes thirty (30) days after receiving written notice from grantors shall act as termination of said right to use.'

"Thus, the Peoples deed conveyed title to Lot #3 as well as an exclusive right to use, in common with the owners of Lots #1, #2, #4, and #5, a second parcel described above. The court will refer to this parcel as the 'lakefront premises' because it is called that in the Peoples deed. The chain of title for Lot #3 and the exclusive right to the use [of] the lakefront premises ultimately led from the Peoples deed to a November 17, 2015 warranty deed to the plaintiffs using the same descriptions of both parcels as contained in the Peoples deed.[1]

"Lot #10 as shown on the 1970 subdivision map was the subject of a resubdivision in 1973 and is shown on a plot plan in 1975. Although the evidence [at trial] [did] not contain a copy of the first conveyance of Lot #10 out of the subdivision, there [was] circumstantial evidence that it was a deed to Richard C. Kleinburg soon after the plot plan in 1975. By warranty deed from Richard C. Kleinburg dated August 5, 2011, the defendant

---

[1] The parties and the court quote the relevant deed language from the Peoples deed rather than from the plaintiffs' deed. We note that the plaintiffs' deed differs only in that Velardi is misspelled as "Vilardi," the term "grantee" is replaced with "grantees," the term "grantors" is replaced with "Quinlans," and it provides that the grantees are entitled "to use aforesaid lakefront premises" instead of "to use *of* aforesaid lakefront premises." (Emphasis added.) Because none of these differences is material to the plaintiffs' claims, in the interest of simplicity we refer only to the language of the Peoples deed throughout this opinion.

acquired Lot #10 of the subdivision (defendant's property). The warranty deed states that the conveyance of Lot #10 to the defendant is '[s]ubject to rights to use a portion of the lake frontage more particularly described in Warranty Deeds recorded in Volume 76, Page 260, Volume 76, Page 262, and Volume 76, page 396, and Volume 218, Page 214 of the Washington Land Records.'[2] The Peoples deed is recorded in Volume 76, Page 262, of the Washington Land Records. As a result of this title history, the defendant's property is subject to the plaintiffs' exclusive right to use the lakefront premises together with the owners of Lots #1, #2, #4 and #5.

"A public highway known as West Shore Road extends across the defendant's property. The portion of West Shore Road extending across the defendant's property is a three rod[3] highway which is approximately fifty feet in width containing a paved way of approximately twenty-five feet in width with unpaved unimproved shoulders approximately 12.5 feet in width on each side of the pavement. The state of Connecticut does not own the fee interest in the improved or unimproved portion of the public highway easement. The general public maintains a right-of-way over the improved and unimproved portion[s] of West Shore Road pursuant to the state of Connecticut's highway easement.

"The only other relevant title history concerns two lots which are adjacent to the easterly boundary of the lakefront premises. These lots were also created by Thomas F. Quinlan acting on behalf of The Quinlan Corporation. The immediately adjacent lot was conveyed to Nancy Ann Velardi in April, 1970, and is shown on a map also drawn by Charles J. Osborne Associates

---

[2] The defendant's deed incorporates the 1975 plot plan, which does not differ from the 1970 subdivision map in any way that is material to this appeal.

[3] "A rod is a unit of measurement equal to 16.5 feet." (Internal quotation marks omitted.) *Marchesi* v. *Board of Selectmen*, 328 Conn. 615, 644 n.22, 181 A.3d 531 (2018).

and will be referred to as the 'Velardi lot.' The adjoining lot to the east was conveyed by The Quinlan Corporation in 1969 and will be referred to as the 'Lafata lot.'

"Within a few days after July 23, 2014, the defendant, with the approval of the state of Connecticut, constructed a three foot high picket fence approximately in the middle of the northerly unpaved shoulder of West Shore Road. The fence is located on the defendant's property within the state's right-of-way. During the spring or summer of 2019, with the approval of the state . . . the defendant planted a hedge along the northerly side of the picket fence." (Footnotes added.) As a result, a dispute arose between the plaintiffs and the defendant as to the exact location of the southerly boundary of the lakefront premises.

"The plaintiffs . . . brought this case against the defendant . . . [on November 5, 2019] and [they] filed a two count amended complaint on December 20, 2021.[4] The first count ask[ed] the court to quiet title to [the lakefront premises]. The second count [was] based on trespass on that property." (Footnote added.) In their amended complaint, "[t]he plaintiffs allege[d] that the defendant installed . . . [the] picket fence and . . . hedge on [the lakefront premises] over which they claim to have exclusive use rights. The defendant respond[ed] that he installed the picket fence and hedge on his own property over which the plaintiffs have no rights. The defendant also allege[d] several special defenses, including that the plaintiffs' claims are barred by the statute of limitations.

"This case was tried to the court on May 17, 2022. The court viewed the property on June 2, 2022."

---

[4] The plaintiffs' original complaint also included a third count alleging public nuisance. The court struck this claim from the plaintiffs' complaint on November 30, 2021, and it is not at issue on appeal.

During trial, "[t]he plaintiffs argue[d] that the language of the [Peoples deed] should be interpreted so that the words 'the state highway known as West Shore Road' mean only the paved portion of the entire highway easement. The plaintiffs point[ed] out that the paved portion of West Shore Road is a known and fixed monument [that] is shown on the 1970 subdivision map and must prevail over the distance call of 'about 90 feet' in the description of the westerly length of the lakefront premises. The unpaved shoulders of the road are not shown on the 1970 subdivision map in the area where the lakefront premises is situated, although the shoulder is shown to the south of the Velardi and Lafata lots and at other places on the map. Alternatively, the plaintiffs argue[d] that the Peoples deed actually conveyed a fee interest in the lakefront premises because it conveyed only possessory rights and not nonpossessory rights associated with an easement. The plaintiffs argue[d] that as fee owners they are entitled to the well established rebuttable presumption that when a public highway is not owned by a state or municipality, the landowner that abuts the highway owns up to the center line."[5]

"In support of their position, the plaintiffs offered factual evidence from the defendant's disclosed expert

---

[5] During trial, the defendant called Attorney Gerald Garlick to testify regarding this issue as an expert in real estate law. Over the objection of the plaintiffs' counsel, the court allowed Garlick's testimony, including his opinion that the defendant owned the lakefront premises in fee simple subject to the rights of the plaintiffs and the other property owners referred to in the Peoples deed to exclusively use the property. The plaintiffs' counsel also objected to a question about Garlick's opinion as to who owned the unpaved shoulder of the highway, to which Garlick responded that, in his opinion, the defendant owned the shoulder area. In its memorandum of decision, the court stated that it "now sustain[ed] the plaintiffs' objection and str[uck] [Garlick's] opinion as to the ownership of the shoulder of West Shore Road . . . [because] the issue of the ownership of the shoulder of West Shore Road is an ultimate issue in the case and calls for a legal conclusion which the court must make. [Therefore] [t]he court [did] not consider the opinion given by [Garlick]."

surveyor named Bryan Nesteriak, who had drawn a map showing the defendant's property including the lakefront premises. He testified as a fact witness to many of the underlying facts set forth in [the court's memorandum of] decision."

"The defendant argue[d] that the plain language of the description of the lakefront premises in the Peoples deed is clear and does not include the shoulder of the road." In support of this argument, the defendant relied on the testimony of Nesteriak, whom he called as an expert witness to offer Nesteriak's opinion about the boundaries of the lakefront premises. The plaintiffs stipulated to Nesteriak's qualifications as an expert in land surveying.

Nesteriak testified that he was able to determine with a reasonable degree of scientific certainty that the fence and hedgerow are not located within the lakefront premises. He testified that "the definition of a highway includes the unimproved portions on the side [and] the improved portions." He also testified that the state highway known as West Shore Road is 49.5 feet wide, and to determine the total area designated for the highway, he measured one half of that width from the center of the highway on either side. He concluded that the lakefront premises ends at the highway easement line— that is, at the edge of the unpaved shoulder. He testified that the location of the highway on the 1970 subdivision map is consistent with its location on his survey map, except that the 1970 subdivision map appears to show only the paved road and not the highway easement line.

Nesteriak further testified that the southerly boundary of the Velardi lot "coincides with the highway [easement] line," which he believed also is consistent with the 1970 subdivision map. He stated that he extended that same highway easement line to create the southerly boundary of the lakefront premises. The court credited,

in particular, Nesteriak's testimony that he found a vehicle axle in the northerly line of the state's highway easement and that sometimes "a small vehicle axle" is "used for noting property corners." He explained that, when marking property boundaries near a state highway, surveyors place markers "along the edges" of the highway easement, but they would place a marker *within* the state's highway easement "[i]f there was an easement over the highway, that's within the property of the highway, for some other purpose." According to the survey map, Nesteriak concluded, however, that in this case the vehicle axle in the northerly line of the highway easement marks both the southwestern corner of the lakefront premises and the northerly boundary of the highway easement.

Nesteriak testified that, when determining the boundaries of the lakefront premises, he considered the distance of "about 90 feet" stated in the Peoples deed. He acknowledged, however, that distances are less reliable than physical monuments as a method of locating boundary lines. According to Nesteriak, "[t]he ninety feet is a measurement that is put in the [Peoples] deed, it says 'about 90,' which means, it's more or less [than] ninety. The eastern side of the easement did end up being approximately ninety, it was 89.9 feet. The western section did not end up being exactly ninety, it was 82.46, which still, in surveying terms, is about ninety feet." He also testified that if the westerly boundary of the lakefront premises were ninety feet instead of only 82.46 feet, although it would be "[a]bout eight feet" closer to the pavement than where he determined that the westerly boundary line ends, it nonetheless would end "short of the hedgerow, approximately," such that the fence and hedgerow would still be on the defendant's property and not within the lakefront premises. Nesteriak did not agree that the boundary should be

extended in that manner "[b]ecause the [state's] easement was there before this exclusive right to use [the lakefront premises] was given, and the description says, specifically, that it goes to the highway."

On the basis of his survey, Nesteriak concluded that the four boundaries of the lakefront premises are as follows: (1) the easterly boundary runs in a northerly direction for 89.9 feet, from an iron pin[6] found at the southwestern corner of the Velardi lot to the edge of Lake Waramaug, passing through another iron pin near the northwestern corner of the Velardi lot, (2) the northerly boundary runs in a westerly direction along the edge of Lake Waramaug for approximately 125 feet, (3) the westerly boundary runs in a southerly direction for 82.46 feet from Lake Waramaug, passing through a vehicle axle found a short distance from the edge of the lake and ending at another axle that coincides with the highway easement line, and (4) the southerly boundary runs from the axle at the highway easement line in

---

[6] During oral argument before this court, there was some confusion as to whether the vehicle axles and the iron pins that Nesteriak found in the field were one and the same. Counsel for the defendant asserted that, other than the lake and the highway, the only physical monument that Nesteriak found in the field was an iron pin in the southwestern corner of the Velardi lot. Counsel for the plaintiffs initially disputed that Nesteriak found a vehicle axle in the field but, after reviewing the record, the plaintiffs' counsel asserted that Nesteriak found "an object" not "on the Velardi side" of the lakefront premises but "on the distance between the road and the lake where there was no line shown on the 1970 [subdivision] map." The plaintiffs' counsel changed his position again during his rebuttal argument, when he agreed with the defendant's counsel that the references to an axle in the record are to a marker "near the Velardi line." Nonetheless, counsel's expressed understanding at oral argument before us is inconsistent with the court's factual findings and with Nesteriak's testimony and survey map, which indicate that Nesteriak found two vehicle axles and two iron pins during his survey of the lakefront premises. The court credited Nesteriak's testimony that he found a vehicle axle in the southwestern corner of the lakefront premises, which he used to locate the boundary lines. Moreover, Nesteriak's survey map shows that he found a second axle in the northwestern corner of the lakefront premises and found an iron pin in the southwestern corner of the Velardi lot and another in the northwestern corner.

an easterly direction for approximately 125 feet and closes with the easterly boundary at the iron pin found at the southwestern corner of the Velardi lot. Thus, it was Nesteriak's opinion that the southerly boundary of the lakefront premises is located at the highway easement line, that is, at the edge of the unpaved shoulder of West Shore Road.

"The plaintiffs filed their posttrial brief on August [8], 2022, the defendant filed his posttrial brief on September 7, 2022, and the plaintiffs filed their posttrial reply brief on September 19, 2022. On December 19, 2022, the parties filed a written stipulation that the court's time to enter judgment would be extended to February 28, 2023."

On February 22, 2023, the court issued a memorandum of decision rendering judgment for the defendant. On the basis of the evidence presented at trial, the court concluded that "the words 'the state highway known as West Shore Road' as used in the Peoples deed means the entire easement held by the state and not just the paved portion." The court explained: "The court's finding is influenced, in part, by the opinions of the defendant's expert surveyor, [Nesteriak]. The court found him to be highly credible and convincing. He conducted a thorough review of the available deeds and maps, performed field work and produced a clear and detailed map of his own. . . .

"The plaintiffs did not have a surveyor to contradict the testimony of [Nesteriak], but this does not mean that the court is bound to accept it. . . . Here, the court accepts the testimony of [Nesteriak], along with other evidence to be discussed weighing in favor of the defendant.

"The plaintiffs point out three principal reasons why [Nesteriak] is wrong. The court will address those reasons in turn. The first reason can be summarized as

follows: the lakefront premises [are] described in the Peoples deed as being 'shown on said map.' 'Said map' is the 1970 subdivision map. The effect of the reference to the map is to incorporate the 1970 [subdivision] map into the Peoples deed. . . . The plaintiffs argue that the 1970 subdivision map only depicts the paved portion of West Shore Road; it does not include a demarcation of the shoulder of the road in the area of the lakefront premises, although such a demarcation is shown at other places on the 1970 [subdivision] map.

"The weakness of this argument is that the lakefront premises is not depicted as a separate property on the 1970 subdivision map. The defendant's property, Lot #10, is depicted as including the highway and the entire area north of the pavement and south of the lake. The 1970 subdivision map was drawn before the lakefront premises was created in 1971 by the Peoples deed and the deeds to Lots #1, #2, #4 and #5. There would have been no reason for the surveyor to have drawn the shoulders of the highway because it was all included within Lot #10 and would have had no significance at the time the 1970 subdivision map was drawn.

"The plaintiffs' next reason to doubt [Nesteriak's] opinion is that, although the Peoples deed describes the lakefront premises as having a westerly side of 'about 90 feet,' [Nesteriak's] map shows the westerly side as being only 82.46 feet. This is because [Nesteriak's] map shows the westerly side of the . . . lakefront premises ending at an axle he found in the northerly line of the state's easement, not at the edge of the highway pavement. [Nesteriak] testified that a small vehicle axle placed on its end is sometimes used for noting property corners. [Nesteriak] admitted that the westerly side of the lakefront premises would have been closer to ninety feet if it ended at the pavement but that a distance of exactly ninety feet would still place the fence and hedge outside the lakefront premises.

The plaintiff[s] [argue] that this discrepancy is a reason to reject [Nesteriak's] map. The court does not find this point to be significant because the language of the [Peoples] deed is 'about 90 feet.' [Nesteriak] testified that in surveying terms 'about' means the same thing as 'more or less' and that 82.46 feet is 'about 90 feet.' Words such as 'more or less' are to be taken in connection with all other features in any transaction; they are words of caution, denoting some uncertainty in the mind of one using them and a desire not to misrepresent. . . . It is clear that the westerly side of the lakefront premises had not been surveyed when the Peoples deed description was written. 'About 90 feet' represented an approximation of the distance to West Shore Road. The approximation is 91.6 percent of the stated distance. The court does [not] find this small discrepancy determinative of the intention of the parties to the Peoples deed.

"The plaintiffs' next argument is that the meaning of the words 'the state highway known as West Shore Road' must be the paved surface of the highway because of a principle that physical monuments have a higher priority than distance calls. [Nesteriak] admitted this to be an established principle in surveying. He also admitted that the paved portion of the state highway is a man-made physical monument, but he did not believe that this principle would change his ultimate conclusion that the fence and hedges were not within the lakefront premises. . . .

"[The plaintiffs argue that] '[a] highway has always been regarded as a fixed monument.' *Frank Towers Corp.* v. *Laviana*, 140 Conn. 45, [51, 97 A.2d 567] (1953). But the principle as stated in our appellate cases is actually, '[w]here the boundaries of land are described by known and fixed monuments which are definite and certain, the monuments will [control] over courses and distances.' [Id., 50.]

"This statement is slightly different from the one advanced by the plaintiff[s] in that 'known and fixed monuments' are not necessarily physical monuments. It is true that '[t]he land of an adjoining proprietor whose boundaries can be fixed by known monuments is also considered to be a monument to establish a boundary.' [Id., 51.] Thus, if the pavement of a three rod state highway easement is a known and fixed monument, the shoulders of the highway are also known and fixed monuments which can easily be calculated and mapped. The court does not believe that the physical pavement of the highway is any more 'known and fixed' than the shoulders.

"The court finds that the most significant part of the description of the lakefront [premises] is the southerly line. That line is described as 'running along said highway for a distance of about 120 feet to the land of Nancy Velardi.'[7] The land of Nancy Velardi is shown on the 1970 subdivision map as a surveyed lot with a westerly boundary extending 89.5 feet[8] in a southerly direction from the shore of Lake Waramaug. The surveying had been done by Charles J. Osborne Associates, the same firm which created the 1970 subdivision map and the

[7] The Peoples deed, from which the court purported to quote, actually states: "running in an easterly direction along said highway for a distance of about 125 feet to land of Nancy Velardi." Elsewhere in its memorandum of decision, the court quoted the language correctly. The court's misquote here does not affect its analysis or our conclusions.

[8] In their appellate brief, the plaintiffs state that the 1970 subdivision map shows that the westerly boundary of the Velardi lot is 82.5 feet. At other points in their brief, however, the plaintiffs refer to this same boundary as being 89.5 feet, which is consistent with the court's memorandum of decision, and the plaintiffs do not otherwise challenge the court's statement as to the length of that boundary. We thus presume that the plaintiffs' statement that the westerly boundary of the Velardi lot is 82.5 feet is a scrivener's error. Although the 1970 subdivision map is unclear as to the exact measurement of the westerly boundary of the Velardi lot, because neither party has challenged the court's statement that the map indicates that the boundary is 89.5 feet, we presume that the court is correct.

maps showing the resubdivision of the defendant's land. The exhibit copy of the 1970 subdivision map is not clear enough to read all of the courses and distances, but the common creation of all maps leads the court to find that the westerly boundary of the Velardi lot is known and fixed.

"If the plaintiff[s] [are] correct that the southwest[ern] corner of the lakefront premises is located at the edge of the road pavement and runs along the pavement in an easterly direction, it won't close with the westerly boundary [of] the Velardi lot. In fact, it will be approximately 12.5 feet south of the corner of the Velardi lot. This fact is easily determined just by looking at the 1970 subdivision map and seeing that the southerly boundary of the Velardi lot is separated from the road pavement by the entire shoulder of the highway. The court finds that the plaintiffs' argument that the pavement is the southerly boundary of the lakefront premises results in a description of the lakefront premises which does not close—and not by a small amount. This problem would have been obvious when the Peoples deed was written and weighs heavily on finding the intent of the words in the description. On the other hand, if [Nesteriak's] map is accepted as accurate, the southerly boundary closes perfectly at the southwest corner of the Velardi lot.

"Close scrutiny of the area south of the Velardi and Lafata lots as depicted in the 1970 subdivision map shows that the shoulder of [West] Shore Road separating the two lots from the pavement of the road is part of Lot #10, now owned by the defendant. If the plaintiffs are correct that the plaintiffs own the entire shoulder south of the lakefront premises, it would separate the defendant's small section of the shoulder south of the Velardi and Lafata lots from the rest of Lot #10. It would make no sense that Thomas P. and Marian S. Quinlan, the creators of the entire subdivision, would create such

a small, useless strip of land with no contact with the remainder of Lot #10.

"The court has weighed the evidence and has applied the appropriate law and finds against the plaintiff[s] on the issue of the ownership of the shoulder of [West] Shore Road. Thus, the fence and hedge are not located within the lakefront premises." (Citations omitted; footnotes added.)

The court also rejected the plaintiffs' alternative argument that their right to exclusive use was the equivalent of a fee simple title that entitled them to a rebuttable presumption that they owned to the center of West Shore Road. Instead, the court concluded, on the basis of the plain language of the Peoples deed, that "the intention was to have the lakefront premises remain as part of Lot #10 subject to the [plaintiffs'] right of exclusive use."[9] In its memorandum of decision, the court stated that, "in the absence of any Connecticut authority, [it] [was] not prepared to find that the plaintiffs' chain of title from the Peoples deed grants the plaintiffs fee simple title to the lakefront premises such that they would be entitled to take advantage of a presumption that they own fee simple title to the center of West Shore Road including the shoulder of the highway where the defendant placed the fence and hedge. . . .

\* \* \*

"The court does not need to decide the question as to the exact nature of the plaintiffs' exclusive right to

---

[9] The court also found it "significant that the creators of the subdivision . . . did not obtain resubdivision approval in order to create the lakefront premises. The 1970 subdivision map . . . was marked 'Approved by the Washington Planning Commission at its meeting on January [5], 1971,' and is signed by its chairman, all in conformance with General Statutes § 8-25," which provides that a planning commission must approve all plans for subdivisions of land. The court explained that "this approved subdivision does not depict the lakefront premises as a separate lot. If the Peoples deed had been intended to create a separate lot in fee simple, it would have been separately depicted. The fact that it is not depicted as a separate lot is

use the lakefront premises. It is enough to decide that it is not the equivalent of fee simple title such that it entitles the plaintiffs to a rebuttable presumption that they own to the center of West Shore Road." This appeal followed.

As a preliminary matter, we first set forth the applicable standard of review and relevant legal principles regarding the construction of a deed. Ordinarily, "[t]he construction of a deed . . . presents a question of law which we have plenary power to resolve. . . . In determining the location of a boundary line expressed in a deed, if the description is clear and unambiguous, it governs and the actual intent of the parties is irrelevant." (Citations omitted; internal quotation marks omitted.) *Mackie* v. *Hull*, 69 Conn. App. 538, 541–42, 795 A.2d 1280, cert. denied, 261 Conn. 916, 806 A.2d 1055 (2002), and cert. denied, 261 Conn. 917, 806 A.2d 1055 (2002). When the description of a boundary line in a deed is ambiguous, however, "the question of what the parties intended that line to be is one of fact for the trial court. . . . In the construction of an ambiguous instrument of conveyance, the decisive question of fact is the intent of the parties to the instrument." (Citation omitted.) *Lake Garda Improvement Assn.* v. *Battistoni*, 160 Conn. 503, 511, 280 A.2d 877 (1971); see also *Freidheim* v. *McLaughlin*, 217 Conn. App. 767, 782, 290 A.3d 801 (2023) ("[w]here a deed is ambiguous the intention of the parties is a decisive question of fact" (internal quotation marks omitted)).

"Our basic rule of construction is that recognition will be given to the expressed intention of the parties to a deed . . . and that it shall, if possible, be so construed as to effectuate the intent of the parties. . . . In arriving at the intent expressed . . . in the language

persuasive evidence that no fee simple interest was intended and that no subdivision approval was required."

used, however, it is always admissible to consider the situation of the parties and the circumstances connected with the transaction, and every part of the writing should be considered with the help of that evidence. . . .

"In the construction of a deed or grant, the language is to be construed in connection with, and in reference to, the nature and condition of the subject matter of the grant at the time the instrument is executed, and the obvious purpose the parties had in view. . . . [I]f the meaning of the language contained in a deed or conveyance is not clear, the trial court is bound to consider any relevant extrinsic evidence presented by the parties for the purpose of clarifying the ambiguity. . . .

"Furthermore, [a] reference to [a] map in [a] deed, [f]or a more particular description, incorporates [the map] into the deed as fully and effectually as if copied therein. . . . [T]he identifying or explanatory features contained in maps referred to in a deed become part of the deed, and so are entitled to consideration in interpreting the deed as though they were expressly recited therein." (Internal quotation marks omitted.) *Williams* v. *Green Power Ventures, LLC*, 221 Conn. App. 657, 674, 303 A.3d 13 (2023), cert. denied, 348 Conn. 938, 307 A.3d 273 (2024). We must consider both the deed and the map as a whole to determine the parties' intent. See *Rocamora* v. *Heaney*, 144 Conn. App. 658, 666, 74 A.3d 457 (2013) ("In construing a deed, a court must consider the language and terms of the instrument as a whole. . . . This is so not just when the words in a deed are ambiguous, but also when the court determines that a map is unclear or ambiguous." (Citation omitted; internal quotation marks omitted.)).

In the present case, the court concluded that the phrase "the state highway known as West Shore Road"

in the Peoples deed was ambiguous as to whether it included the unpaved portion of the highway, and the court considered extrinsic evidence of the meaning of that phrase in reaching its conclusion. See *Mierzejewski* v. *Laneri*, 130 Conn. App. 306, 313, 23 A.3d 82 ("[t]he court's finding that the defendants' southerly boundary was the stone wall rested on its credibility determinations of the parties' surveyors, which would be necessary only if there was ambiguity in the deed"), cert. denied, 302 Conn. 932, 28 A.3d 344 (2011). Thus, to the extent that the plaintiffs challenge the court's factual findings on appeal, "our review is limited to deciding whether such findings were clearly erroneous. . . . The trial court's findings are binding upon this court unless they are clearly erroneous in light of the evidence . . . . We cannot retry the facts or pass on the credibility of the witnesses. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Mackie* v. *Hull*, supra, 69 Conn. App. 545. By contrast, to the extent that the plaintiffs challenge the court's conclusion that the Peoples deed is ambiguous, our review is plenary. See *Freidheim* v. *McLaughlin*, supra, 217 Conn. App. 782–83 ("[t]he determination as to whether language of [an instrument] is plain and unambiguous is a question of law subject to plenary review" (internal quotation marks omitted)).

I

The plaintiffs first claim that the court's conclusion is contrary to the unambiguous description of the lakefront premises in the Peoples deed. The plaintiffs assert that "the [Peoples] deed used three fixed monuments"—namely, the Velardi lot, West Shore Road, and Lake Waramaug—"to establish a clear and unequivocal

boundary of the [lakefront premises] that could only be understood by the buyer as extending over the entire area between the lake and the physical road . . . ." According to the plaintiffs, because the 1970 subdivision map referenced in the Peoples deed depicts only the paved portion of the highway, the reference in that deed to "the state highway known as West Shore Road" must mean the paved portion that appears on the map.

Additionally, the plaintiffs argue that the grantor drafted the Peoples deed "consistent with [his] understanding, as reflected in his prior deed to Velardi, that the [southerly] Velardi boundary ran to the [paved portion of the] highway and did not end at the point where [that] boundary met the [highway] easement line as marked in the field" and as depicted on the 1970 subdivision map. The plaintiffs assert that the deed to the Velardi lot states that it is bounded southerly by the highway and cite the principle that, when a deed contains such a description, the landowner is presumed to own the fee to the center of the highway.

In advancing these arguments, the plaintiffs minimize the significance of both the iron pin in the southwestern corner of the Velardi lot and the line at the southerly boundary of that lot on the 1970 subdivision map. As depicted on the 1970 subdivision map, the southerly boundary of both the Velardi property and the adjoining Lafata lot, which was transferred by the Quinlans in 1969, is the edge of the unpaved portion of the West Shore Road highway easement. Despite what the 1970 subdivision map seems to clearly show, the plaintiffs argue that, instead of depicting the actual boundary, those features merely designate "the location of the [highway] easement line, [which] would be important to [the] owners [of the Velardi lot] to assure that they did not build homes or other accessory structures within the highway easement line." On the basis of their understanding of the physical monuments referred to

in the Peoples deed, the plaintiffs assert that the grantee would have been able to establish "all four corners of the [lakefront premises] based on those monuments identifiable in the field and shown on the map . . . ."

Because the plaintiffs argue that the Peoples deed is unambiguous, they assert that "the legal interpretation of the [Peoples] deed to determine whether the southerly boundary is the highway easement line drawn on the survey or the road which was also on the survey . . . is a legal question for the court" that is subject to plenary review.

We are not convinced that the plaintiffs' interpretation of the Peoples deed and incorporated map is the only reasonable one. Instead, we conclude that the Peoples deed is ambiguous as to the meaning of "the state highway known as West Shore Road" and that the court therefore properly considered extrinsic evidence to resolve the ambiguity.

We begin with the language of the Peoples deed, which describes the lakefront premises as follows: "a certain piece or parcel of land situated on the shore of Lake Waramaug and also shown on [the 1970 subdivision] map, running in a westerly direction for a distance of 125 feet from the land of Nancy Velardi along the shore of Lake Waramaug, thence running in a southerly direction for a distance of about 90 feet to the state highway known as West Shore Road, thence running in an easterly direction along said highway for a distance of about 125 feet to land of Nancy Velardi."

Because the Peoples deed specifies that the 1970 subdivision map describes the parcel of land intended, that map is controlling as to our interpretation of the description provided in the deed. See *Lake Garda Improvement Assn.* v. *Battistoni*, supra, 160 Conn. 510 ("[s]ince the deed specifies that the map describes the roadways intended, that map is controlling"); see also

*Williams* v. *Green Power Ventures, LLC*, supra, 221 Conn. App. 674 (features on map referenced in deed "are entitled to consideration in interpreting the deed as though they were expressly recited therein" (internal quotation marks omitted)). The 1970 subdivision map was prepared prior to the creation of the lakefront premises and thus does not depict the lakefront premises as a separate parcel with defined boundaries. Although the 1970 subdivision map does not include the boundaries of the lakefront premises, it does show the three physical monuments referenced in the Peoples deed—Lake Waramaug, West Shore Road, and the adjacent Velardi lot. The 1970 subdivision map, though, does not appear to depict the paved portion of West Shore Road as a boundary, because the westerly boundary of the Velardi lot is depicted as extending from the shore of Lake Waramaug to a point short of the paved portion of West Shore Road, leaving a strip of land consistent with the unpaved portion of the highway easement between the southerly boundary of the Velardi lot and the paved road.[10] The 1970 subdivision map also depicts the defendant's property, Lot #10, as a contiguous parcel encompassing land on either side of West Shore Road, including the lakefront premises and the strip of land abutting the southerly boundary of the Velardi lot, and West Shore Road itself.

Given the depiction of the boundaries of the Velardi lot on the 1970 subdivision map and the fact that the lakefront premises is not separately defined on that map, it is unclear based on the Peoples deed and the map referenced therein whether the parties to the Peoples deed intended that "the state highway known as West Shore Road" would refer to (1) only the paved

---

[10] This becomes clear upon comparing the 1970 subdivision map to the 1969 subdivision map, which shows the entire 49.5 foot wide highway, including both the paved and unpaved portions, abutting the southerly boundary of the Velardi lot.

portion of the highway depicted on the map, such that the lakefront premises extends to the edge of the paved road, or (2) the entirety of the state's highway easement, including both the paved and unpaved portions, such that, like the Velardi lot shown on the 1970 subdivision map, the lakefront premises extends only to the edge of the unpaved shoulder. Because both interpretations are reasonable based on the Peoples deed and the incorporated 1970 subdivision map, we conclude that the Peoples deed is ambiguous. See *Freidheim* v. *McLaughlin*, supra, 217 Conn. App. 788 ("[b]ecause the deed language is susceptible to more than one reasonable interpretation, it is ambiguous"). Accordingly, we reject the plaintiffs' claim that the Peoples deed can only be read to support their interpretation as a matter of law.

## II

Alternatively, the plaintiffs claim that, assuming arguendo that the Peoples deed is ambiguous as to the meaning of "the state highway known as West Shore Road," the court should have resolved the ambiguity in their favor. Specifically, the plaintiffs argue that, because the exclusive use grant of the lakefront premises in the Peoples deed constituted a transfer of a fee simple interest and not an easement, the court should have applied a presumption that they are the owners of the land to the center of West Shore Road. They further argue that, even without that presumption, the court's finding that the southerly boundary of the lakefront premises ends at the unpaved edge of the highway easement is clearly erroneous for three separate reasons. We address each of the plaintiffs' arguments in turn.[11]

## A

First, the plaintiffs argue that, because the Peoples deed describes the lakefront premises as abutting the

---

[11] For ease of discussion, we address the plaintiffs' arguments in a different order than they are set forth in their principal appellate brief.

public highway, and because their interest in the lakefront premises is akin to fee simple, they are entitled to the rebuttable presumption that the lakefront premises runs to the center of the paved portion of the highway.[12] See *Mierzejewski* v. *Laneri*, supra, 130 Conn. App. 315 ("[a]n abutting owner is presumed under the law of this state, no evidence having been offered to the contrary, to own the fee of the land to the center of the highway" (internal quotation marks omitted)). According to the plaintiffs, their right to the exclusive use of the lakefront premises "is not an easement interest which, by definition, is not possessory." The plaintiffs assert that "the right to exclusive possession of a parcel of land limited only by the possible reversion to another person if taxes are not paid is nearly identical to fee simple ownership." Pointing to precedent from other states, the plaintiffs argue "that [the conveyance of the right to] exclusive use is akin to [the conveyance of] fee simple title and that the rules regarding the boundaries of land [owned] in fee simpl[e] should apply equally to parcels created for the exclusive use of owners of that right."

The defendant argues that the plaintiffs' interest in the lakefront premises is "plainly and clearly" an easement, that he "remains the owner in fee" of the lakefront premises, and that the plaintiffs "have provided no case law or authority whatsoever from this state which finds that an easement can or should be treated . . . as title in fee simple for the application of a presumption regarding expansion of the boundary lines." We agree with the defendant and, accordingly, conclude that the plaintiffs are not entitled to a rebuttable presumption that they own to the center of West Shore Road.

---

[12] In their appellate brief, the plaintiffs present this as a separate claim, and the court also addressed it as one in its memorandum of decision. Because we view it as an argument in support of the plaintiffs' overall claim that the court's conclusion as to the boundaries of the lakefront premises was improper, we do not address it as a separate claim.

Because the Peoples deed contains no ambiguity as to the type of property interest conveyed, "the determination of the intent behind [the] language in [the] deed, considered in the light of all the surrounding circumstances, presents a question of law on which our scope of review is plenary." (Internal quotation marks omitted.) *Stefanoni* v. *Duncan*, 282 Conn. 686, 699, 923 A.2d 737 (2007).

The following principles pertaining to fee interests and easements guide our analysis. "[F]ee simple ownership [is] a term that merely reflects ownership of a whole or unlimited estate." (Internal quotation marks omitted.) *Morton* v. *Syriac*, 196 Conn. App. 183, 202, 229 A.3d 1129, cert. denied, 335 Conn. 915, 229 A.3d 1045 (2020); see also *Redevelopment Agency* v. *Norwalk Aluminum Foundry Corp.*, 155 Conn. 397, 401, 233 A.2d 1 (1967) ("[a] fee simple interest with possession . . . is a whole or unlimited interest embracing all the elements of complete ownership"). By contrast, "[a]n easement creates a nonpossessory right to enter and use land in the possession of another and obligates the possessor not to interfere with the rules authorized by the easement. . . . [T]he benefit of an easement . . . is considered a nonpossessory interest in land because it generally authorizes limited uses of the burdened property for a particular purpose. . . . [E]asements are not ownership interests but rather privileges to use [the] land of another in [a] certain manner for [a] certain purpose . . . . In determining the character and extent of an easement created by deed, the ordinary import of the language will be accepted as indicative of the intention of the parties, unless there is something in the situation of the property or the surrounding circumstances that calls for a different interpretation." (Citation omitted; internal quotation marks omitted.) *Stefanoni* v. *Duncan*, supra, 282 Conn. 700.

Here, it is clear from the plain language of the Peoples deed that the grantor intended to convey only an easement over the lakefront premises rather than an unlimited interest akin to fee simple title. The paragraph of the Peoples deed granting the easement first provides: "Together with the exclusive[13] right to use, in common with owner or owners of Lots #1, #2, #4 and #5 as shown on [the 1970 subdivision] map, a certain piece or parcel of land . . . ." (Footnote added.) Our Supreme Court has interpreted almost identical language as conveying an easement. See *Il Giardino, LLC* v. *Belle Haven Land Co.*, 254 Conn. 502, 506, 757 A.2d 1103 (2000) (by its express terms, deed conveying various parcels " 'together with the right to use in common with others' " certain roadways conveyed easement). Moreover, although the plaintiffs describe their right to use and possess the property as "unlimited," the plaintiffs' use is in fact subject to several restrictions.[14] Specifically, the Peoples deed limits the plaintiffs' use to "the private use of grantee and friends with no commercial activities to be conducted thereon . . . ." The plaintiffs also are limited to "only one dock and one float" and are prohibited from placing any "fence or building, permanent

---

[13] Our Supreme Court has stated that, in the context of an exclusive easement, "exclusive means that the easement holder[s] ha[ve] the sole right to engage in the type of use authorized by the servitude." (Internal quotation marks omitted.) *Zhang* v. *Omnipoint Communications Enterprises, Inc.*, 272 Conn. 627, 642, 866 A.2d 588 (2005).

[14] Contrary to the defendant's assertion, however, the Peoples deed does not indicate that the plaintiffs were conveyed an easement only for the purposes of ingress and egress over the lakefront premises in order to access the lake. In connection with this assertion, the defendant argues that the plaintiffs "attempt to improperly expand" the scope of the right conveyed in the Peoples deed "to include parking." The court concluded that there was no evidence presented at trial in support of the defendant's argument, and our review of the record has revealed none. Moreover, in their reply brief, the plaintiffs clarify that they only "ask the court to interpret the deed language together with the map reference[d] in the deed to determine its boundaries." Accordingly, we do not address the defendant's argument that the plaintiffs are attempting to expand the scope of their right to use the lakefront premises.

or otherwise" on the lakefront premises. Finally, the plaintiffs are required to "pay their pro-rata share of taxes that accrue on [the] lakefront premises," and failure to pay such taxes thirty days after receiving written notice from the grantors "shall act as a termination of [the plaintiffs'] right to use." These limitations, and the possibility that the plaintiffs' use will terminate if they fail to pay taxes, are inconsistent with the grant of a "whole or unlimited interest embracing all the elements of complete ownership." *Redevelopment Agency* v. *Norwalk Aluminum Foundry Corp.*, supra, 155 Conn. 401; see also *Eis* v. *Meyer*, 17 Conn. App. 664, 668, 555 A.2d 994 ("[a]n easement may be created which will terminate upon the happening of an event or contingency, or which may be terminated on the occurrence, [or] breach . . . of a condition" (internal quotation marks omitted)), aff'd, 213 Conn. 29, 566 A.2d 422 (1989). Instead, the Peoples deed expresses an intent to create only an exclusive easement over a portion of the defendant's property, which does not entitle the plaintiffs to the presumption of *ownership* to the center line of West Shore Road.[15] Accordingly, the plaintiffs' argument fails.

B

Second, the plaintiffs argue that the court's finding as to the southerly boundary of the lakefront premises

[15] The California and Idaho cases cited by the plaintiffs merely recognize the possibility that an exclusive easement may equate to a fee interest if, despite being labeled an "easement," the interest conveyed creates an unlimited right to use the subject property, which clearly is not the case here. See *Blackmore* v. *Powell*, 150 Cal. App. 4th 1593, 1600, 59 Cal. Rptr. 3d 527 (2007) (easement for parking and garage purposes, with right of exclusive control over garage, did "not rise to fee ownership" because (1) rights accorded grantee were expressly circumscribed and (2) right to exclusive control was intended solely to protect those restricted rights); *Raab* v. *Casper*, 51 Cal. App. 3d 866, 877, 124 Cal. Rptr. 590 (1975) ("[i]f a conveyance purported to transfer to A an *unlimited* use or enjoyment of Blackacre, it would be in effect a conveyance of ownership to A, not of an easement" (emphasis in original; internal quotation marks omitted)); *Latham* v. *Garner*, 105 Idaho 854, 856 n.1, 673 P.2d 1048 (1983) (observing

is clearly erroneous because it is premised on the incorrect conclusion that, if the lakefront premises extends to the edge of the paved road, the southerly boundary of the lakefront premises would not close with the westerly boundary of the Velardi lot. The plaintiffs make two arguments challenging this conclusion. First, they argue that the southerly boundary of the lakefront premises would close "perfectly" with the Velardi lot "based on the Velardi deed that . . . state[s] that [the Velardi lot] was bounded by the road itself . . . ." Second, the plaintiffs argue that, even if the court was correct that the Velardi lot does not extend to the paved road and the defendant therefore owns the unpaved shoulder in front of the Velardi lot, "that discrepancy would not result in lack of closure but would only result in the defendant owning a portion of the land abutting the [lakefront premises] to the east." We are not persuaded by either argument.

Both of the plaintiffs' arguments essentially challenge the court's factual findings. We reiterate that "our review is limited to deciding whether such findings were clearly erroneous." (Internal quotation marks omitted.) *Mackie* v. *Hull*, supra, 69 Conn. App. 545. Under that deferential standard of review, it is not our role "to weigh the evidence and the credibility of the parties and to find the facts . . . [or to] examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached. Rather, we focus on the conclusion of the trial court, as well as the method by which it arrived at that conclusion, to determine whether it is legally correct and factually supported." (Citation omitted; internal quotation marks omitted.) *Chebro* v. *Audette*, 138 Conn. App. 278, 284, 50 A.3d 978 (2012).

that exclusive easement "ceases to be an easement *only where the whole exclusive use of a thing is conveyed*" (emphasis altered)).

First, as to the plaintiffs' argument challenging the court's finding that the Velardi lot extends only to the unpaved shoulder of West Shore Road, as opposed to the paved edge of the road, we conclude that there is ample evidence in the record to support that finding. The 1970 subdivision map incorporated into the Peoples deed clearly depicts the Velardi lot as extending to a point short of the paved road.[16] In reaching its conclusion, the court was entitled to rely on this map feature as though it were expressly recited in the Peoples deed. See *Williams* v. *Green Power Ventures, LLC*, supra, 221 Conn. App. 674 ("[t]he identifying or explanatory features contained in maps referred to in a deed become part of the deed, and so are entitled to consideration in interpreting the deed as though they were expressly recited therein" (internal quotation marks omitted)). Nesteriak's survey lends further support to the court's conclusion. He testified that he found an iron pin in the southwestern corner of the Velardi lot, coinciding with the highway easement line, and his survey map depicts the Velardi lot as extending only to the location of that iron pin at the unpaved shoulder of the highway.

The plaintiffs argue that the iron pin at the corner of the Velardi lot and the southerly boundary line of the Velardi lot shown on the 1970 subdivision map do not mark the boundaries of that lot but instead merely designate the location of the highway easement line. Although that is one possible interpretation of the 1970 subdivision map and the existence of the iron pin, it certainly is not the only one. In fact, the plaintiffs

---

[16] We note that the Velardi deed references another 1970 map that is not part of the record in this case. The plaintiffs do not argue that the boundaries of the Velardi lot might be depicted differently on the map referenced in the Velardi deed than on the 1970 subdivision map. Instead, they appear to assume that, because the map referenced in the Velardi deed was prepared by the same firm that prepared the 1970 subdivision map referenced in the Peoples deed, the maps are substantially the same.

offered little evidence in support of their argument.[17] They also ignore the fact that the court had evidence to the contrary, including what appears to be clearly drawn property boundaries of the Velardi lot on the 1970 subdivision map and Nesteriak's unrebutted survey map and testimony. "[I]t is well settled that [t]he weight to be given the evidence and the credibility of the witnesses are within the sole province of the trial court." (Internal quotation marks omitted.) *Commissioner of Transportation* v. *ACP, LLC*, 221 Conn. App. 708, 722, 302 A.3d 936 (2023). To the extent that the plaintiffs similarly challenge the court's reliance on the vehicle axle that Nesteriak found in the southwestern corner of the lakefront premises, we reject that argument for the same reason. Furthermore, although the plaintiffs argue that the Velardi deed states that the Velardi lot is bounded southerly by the highway, and there is a rebuttable presumption that, when a deed contains such a description, the landowner owns the fee to the center of the highway, the court was entitled to disregard that presumption and instead credit the evidence supporting a contrary conclusion. See *In re Blake P.*, 222 Conn. App. 693, 707, 306 A.3d 1130 (2023) ("[a]lthough there may be evidence in the record that would support the

---

[17] At most, counsel for the plaintiffs elicited testimony from Nesteriak that when surveyors mark property boundaries near a state highway, they place markers "along the edges" of the highway easement, and that whether they place markers "within the area that the state could improve the highway . . . depends on what [they are] staking out." For instance, Nesteriak testified that a surveyor would place a marker within the state highway easement "[i]f there was an easement over the highway, that's within the property of the highway, for some other purpose." One possible interpretation of this testimony is that the iron pin at the southwestern corner of the Velardi lot was placed there to designate where the state's highway easement begins, although the Velardi lot extends beyond that point. Another possible interpretation, however, is that the iron pin serves to designate both the northerly boundary of the state highway easement *and* the actual southerly boundary of the Velardi lot. Ultimately, Nesteriak concluded, as reflected on his survey map, that he believed the iron pin marked the corner of the Velardi lot itself, not just the beginning of the highway easement.

[plaintiffs'] position, it is not the role of this court to examine that evidence and substitute our judgment for that of the trial court").

Second, the court's conclusion that the boundaries of the lakefront premises close at the southwestern corner of the Velardi lot only when the court adopts the defendant's position is supported by the record. Given that the Peoples deed describes the lakefront premises as both beginning and ending at the Velardi lot, the court properly relied on the boundaries of that lot as shown on the 1970 subdivision map. See *Marshall* v. *Soffer*, 58 Conn. App. 737, 744, 756 A.2d 284 (2000) ("[a]djacent land may be a monument if the boundary of it is fixed"). Thus, accepting the plaintiffs' interpretation of the Peoples deed that the southerly boundary of the lakefront premises is the paved portion of West Shore Road would mean that there would be a 12.5 foot gap between the southwestern corner of the Velardi property and the southeastern corner of the lakefront premises.[18] We cannot say that it was unreasonable for

[18] The plaintiffs contend that, by viewing this as the most significant part of the description in the Peoples deed, the court improperly prioritized distances over physical monuments. We are not convinced. It is true that, where there is a conflict between calls in a deed description, "a default hierarchy has developed, in which various classifications of monuments are deemed generally to be of greater dignity than others. Under the prevailing general hierarchy, other things being equal, resort is to be had first to natural objects or landmarks, next to artificial monuments, then to adjacent boundaries (which are considered a sort of monument) and thereafter to courses and distances." (Emphasis omitted; internal quotation marks omitted.) *Mackie* v. *Hull*, supra, 69 Conn. App. 543. Nesteriak's survey method, on which the court relied, did not deviate from this principle. His testimony indicates that he considered the distances set forth in the Peoples deed but viewed the physical monuments referred to in the deed as controlling. That Nesteriak's survey of the lakefront premises resulted in boundaries that, when measured by reference to the monuments called out in the Peoples deed, came close to the approximate distances set forth in the deed only further supports that he properly identified and located those monuments. Indeed, the court found that the greatest discrepancy between the measurements shown on Nesteriak's survey map and the distances set forth in the Peoples deed was insignificant because it was only 8.4 percent short of the "about 90 feet" distance called out in the deed.

the court to reject the plaintiffs' interpretation in favor of one that both resulted in a closed plot of land and gave effect to all of the monuments called out in the Peoples deed. See *Thurlow* v. *Hulten*, Superior Court, judicial district of Hartford, Complex Litigation Docket, Docket Nos. CV-05-4050315-S, CV-09-4050303-S (October 15, 2014) (reprinted at 173 Conn. App. 698, 164 A.3d 862) (trial court accepted survey that established closed boundaries by reference to monuments identified in field over survey that simply drew arbitrary line from end point of incomplete property description to boundary of adjacent property), aff'd, 173 Conn. App. 694, 164 A.3d 858 (2017); see also *Koennicke* v. *Maiorano*, 43 Conn. App. 1, 19, 22, 682 A.2d 1046 (1996) (affirming trial court's conclusion as to location of boundary line where court adopted boundary line "that track[ed] the calls set out in [the] deed and [did] not ignore any of those calls").

Moreover, the court credited Nesteriak's testimony and survey map, which indicate that the southerly boundary of the lakefront premises extends only to the unpaved shoulder of the highway and closes with the westerly boundary of the Velardi lot. To the extent that the plaintiffs challenge Nesteriak's survey method, we note that Nesteriak's survey properly tracked the monuments referred to in the Peoples deed, which he identified and located by reference to the axles and iron pins in the field.[19] The court found that Nesteriak was highly

---

[19] To the extent that the plaintiffs argue that the court improperly relied on the vehicle axles and iron pins that Nesteriak found in the field despite those objects not being mentioned in the Peoples deed or shown on the 1970 subdivision map, we are not persuaded. A court may rely on extrinsic evidence to help "identify and locate" a boundary or monument that is referred to in the deed. See *Tierney* v. *Second Ecclesiastical Society of North Canaan*, 103 Conn. 332, 334–35, 130 A. 286 (1925) (where deed described property conveyed to plaintiff as "bounded [n]orth on highway, [e]asterly and [s]outherly on highway and [w]est on Lucy Joslin's land," fence along easterly side of plaintiff's land adjoining highway, even though not called out in deed, "helped identify and locate the easterly boundary as the monument described in the deed"); *Roberti* v. *Atwater*, 43 Conn. 540,

credible and rejected the plaintiffs' arguments challeng-
ing his testimony. We will not second-guess those deter-
minations on appeal. See *Alpha Beta Capital Partners,
L.P.* v. *Pursuit Investment Management, LLC*, 193
Conn. App. 381, 441, 219 A.3d 801 (2019) ("to the extent
that the court's decision is founded on its credibility
determinations, we cannot second-guess those determi-
nations on appeal"), cert. denied, 334 Conn. 911, 221
A.3d 446 (2020), and cert. denied, 334 Conn. 911, 221
A.3d 446 (2020).

Accordingly, because the court's findings as to the
locations of the boundaries of the Velardi lot and the
lakefront premises find support in the record, and there-
fore are not clearly erroneous, we reject the plaintiffs'
arguments challenging those findings.[20]

C

Third, the plaintiffs argue that "[t]here is no legal or
logical basis" for the court's conclusion that the strip
of land in front of the Velardi and Lafata lots would be
"useless" to the grantor unless he also retained the

547 (1876) (extrinsic evidence that fences "mark[ed] definitely and visibly
the line of the lots on which the distributed premises were bounded . . .
was admissible, upon the ordinary principle that you may always by such
evidence identify and locate the boundaries or monuments described in the
deed"); see also *Young Men's Christian Assn. of Meriden* v. *Zemel Bros.,
Inc.*, 171 Conn. 310, 311–12, 370 A.2d 937 (1976) (affirming trial court's
conclusion that boundary of plaintiff's land described in deed as " 'top of
the mountain' " was town line, which was clearly designated on mountain
by brownstone monuments). Therefore, the court, by relying on Nesteriak's
survey map in reaching its conclusion, properly relied on the iron pins and
axles to locate and identify the monuments referred to in the Peoples deed.

[20] To the extent that the plaintiffs argue on appeal that, under the court's
construction of the Peoples deed, the lakefront premises is landlocked
because "no easement was granted [to the plaintiffs] over the shoulder [of
West Shore Road] to the [lakefront premises]," that argument merits little
discussion. It is undisputed that the general public maintains a right-of-way
over both the paved and unpaved portions of the highway and that, despite
the fence and hedge, the plaintiffs can still access the lakefront premises
by traveling farther east on West Shore Road.

unpaved shoulder abutting the lakefront premises. According to the plaintiffs, "the shoulder of the highway [in front of the Velardi and Lafata lots] . . . would have no more or less value if [it] adjoined the road shoulder on the [lakefront premises]. The strip in front of the Velardi [and Lafata lots] would be fully accessible by the highway and could be used only as the state would permit. . . . What does not make sense is why . . . a grantor establishing a lot fronting on a highway would retain title to the shoulder of the highway." We disagree.

The unpaved shoulder of the highway abutting the Velardi lot, although perhaps not entirely useless to the grantor if he does not own the unpaved shoulder abutting the lakefront premises, would nonetheless have more value to the grantor if he also retained ownership of the neighboring strip of land. In other words, the court reasonably inferred on the basis of the evidence that the Quinlans' intention to retain ownership of the unpaved shoulder abutting the Velardi lot—an intention that is apparent from the 1970 subdivision map—made it more likely that they also intended to retain ownership of the unpaved shoulder abutting the lakefront premises, so as to retain for themselves a single contiguous parcel subject only to the public right-of-way over the highway. The court "is not required to draw only those inferences consistent with one view of the evidence, but may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical." (Emphasis omitted; internal quotation marks omitted.) *Cheshire Land Trust, LLC* v. *Casey*, 156 Conn. App. 833, 852, 115 A.3d 497 (2015). We cannot say that the inferences drawn by the court in reaching its conclusion are either unreasonable or illogical. Accordingly, we reject the plaintiffs' argument.

D

Finally, the plaintiffs argue that any ambiguity as to the location of the southerly boundary of the lakefront

premises "must be construed against the grantor, [Quinlan], and not Peoples," the grantee. According to the plaintiffs, "[a]pplying that rule regarding ambiguities, the lakefront [premises] would close by running its [easterly] boundary along the land of Velardi to [the iron] pin [at the southwestern corner of the Velardi lot] and continue along the 12.5 feet of land formerly of [Quinlan] who was the grantor who created the ambiguity." As a result, the lakefront premises would extend to the edge of the paved road.

It is true that "[a]mbiguous language in a grant is ordinarily construed against the grantor, and in favor of the grantee." *Lake Garda Improvement Assn.* v. *Battistoni*, supra, 160 Conn. 514. We do not believe, however, that the court was required to apply that principle in this case. Our case law suggests that this rule is one of "last resort," similar to the rule of contra proferentum, which can be used when interpreting ambiguous contracts. See *Cruz* v. *Visual Perceptions, LLC*, 311 Conn. 93, 107, 84 A.3d 828 (2014) (describing contra proferentum as rule of construction of contracts that is "applicable *only as a last resort*, when other techniques of interpretation and construction have not resolved the question of which of two or more possible meanings the court should choose" (emphasis added; internal quotation marks omitted)).

In construing deeds, our courts have applied the principle advanced by the plaintiffs only where the evidence already favored construing the deed in the grantee's favor[21] or when, even after considering extrinsic evidence and other rules of construction, doubt remained

---

[21] Notably, this was true in both cases cited by the plaintiffs. See *Lake Garda Improvement Assn.* v. *Battistoni*, supra, 160 Conn. 513–14 (trial court's conclusion that beach area was intended to be conveyed to plaintiff-grantee as portion of roadway was supported by circumstances at time of conveyance, including that charter of plaintiff-grantee, which was adopted only nineteen days before deed was executed, permitted it to control, own, and care for roadways and beaches and that roadway was not "substantially straight" such that larger roadway grant than usual might have been neces-

as to the intention of the parties to an ambiguous deed such that the ambiguity was "irreconcilable." See, e.g., *Mackin* v. *Mackin*, 186 Conn. 185, 189, 439 A.2d 1086 (1982) ("[a]ny ambiguity in the instrument creating an easement, *in a case of reasonable doubt*, will be construed in favor of the grantee" (emphasis added)); *Bueno* v. *Firgeleski*, 180 Conn. App. 384, 405, 183 A.3d 1176 (2018) ("Where a deed is ambiguous the intention of the parties is a decisive question of fact. . . . *In case of doubt*, the grant will be taken most strongly against the grantor." (Emphasis added; internal quotation marks omitted.)), quoting *Faiola* v. *Faiola*, 156 Conn. 12, 18, 238 A.2d 405 (1968); *Mackie* v. *Hull*, supra, 69 Conn. App. 544 ("[T]he search for greater certainty in one of the calls [in the deed] to prevail over the other as an expression of the parties' mutual intent leaves us at an impasse. *In such a case of irreconcilable ambiguity*, we are left with the principle that the ambiguity is to be resolved against the grantor." (Emphasis added.)); see also *Clark* v. *Beloff*, 71 Conn. 237, 243–44, 41 A. 801 (1898) ("the rule that the words of a deed shall be construed most strongly against the grantor . . . only means that if the words are capable of two or more meanings, and *after all the legitimate aids to the discovery of their meaning have been used*, we are still unable to determine which of those meanings was the one intended, we must take that one of them which is most favorable to the grantee" (emphasis added)). In the present case, the court properly considered extrinsic evidence to resolve the ambiguity and determine the intent of the parties to the Peoples deed. Accordingly,

---

sary to allow room to straighten road); *Faiola* v. *Faiola*, 156 Conn. 12, 18, 238 A.2d 405 (1968) (affirming trial court's conclusion that deed conveyed fee simple title rather than life estate to grantee where trial court had found that plaintiff-grantor's testimony as to parties' intent to convey life estate was " 'utterly unconvincing' "). Thus, neither of these cases suggest that a court should construe an ambiguous deed in the grantee's favor where the evidence indicates that a different meaning was intended.

because the court was able to resolve the ambiguity on the basis of that evidence, it was unnecessary for the court to resort to the rule advanced by the plaintiffs.

In sum, we conclude that, because there is ample evidence in the record to support the court's finding that the lakefront premises extends only to the unpaved portion of West Shore Road, that finding is not clearly erroneous.[22]

The judgment is affirmed.

In this opinion the other judges concurred.

---

[22] Given our conclusion, we do not address the defendant's argument that the plaintiffs' claims are barred by the statute of limitations.

# APPENDIX

